[Cite as *Haggard v. Durrani*, 2025-Ohio-5327.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| LENORA HAGGARD, | : | APPEAL NO. C-240300 |
| | | TRIAL NO. A-1706514 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| ABUBAKAR ATIQ DURRANI, M.D., | : | |
| and | : | |
| CENTER FOR ADVANCED SPINE TECHNOLOGIES, | : | |
| | : | |
| Defendants-Appellants. | : | |

| | | |
|---|---|---|
| THOMAS MEYERS, | : | APPEAL NO. C-240301 |
| | | TRIAL NO. A-1706581 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *JUDGMENT ENTRY* |
| ABUBAKAR ATIQ DURRANI, M.D., | : | |
| and | : | |
| CENTER FOR ADVANCED SPINE TECHNOLOGIES, | : | |
| | : | |
| Defendants-Appellants. | : | |

This cause was heard upon the appeals, the records, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgments of the trial court are affirmed in part and reversed in part, and the cause is remanded.

Further, the court holds that there were reasonable grounds for these appeals, allows no penalty, and orders that costs are taxed 50% to appellants and 50% to appellee in each appeal.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 11/26/2025 per order of the court.**

**By:**_____

   **Administrative Judge**

[Cite as *Haggard v. Durrani*, 2025-Ohio-5327.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | | |
|---|---|---|---|
| LENORA HAGGARD, | : | APPEAL NO. | C-240300 |
| | | TRIAL NO. | A-1706514 |
| Plaintiff-Appellee, | : | | |
| vs. | : | | |
| ABUBAKAR ATIQ DURRANI, M.D., | : | | |
| and | : | | |
| CENTER FOR ADVANCED SPINE TECHNOLOGIES, | : | | |
| | : | | |
| Defendants-Appellants. | : | | |
| | : | | |

| | | | |
|---|---|---|---|
| THOMAS MEYERS, | : | APPEAL NO. | C-240301 |
| | | TRIAL NO. | A-1706581 |
| Plaintiff-Appellee, | : | | |
| vs. | : | | |
| ABUBAKAR ATIQ DURRANI, M.D., | : | *O P I N I O N* | |
| and | : | | |
| CENTER FOR ADVANCED SPINE TECHNOLOGIES, | : | | |
| | : | | |
| Defendants-Appellants. | : | | |
| | : | | |
| | : | | |


Civil Appeals From: Hamilton County Court of Common Pleas

# OHIO FIRST DISTRICT COURT OF APPEALS

Judgments Appealed From Are: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: November 26, 2025

*Statman Harris LLC* and *Alan Statman,* for Plaintiffs-Appellees,

*Taft Stettinius & Hollister LLP, Philip D. Williamson, Aaron M. Herzig, Russell S. Sayre,* and *Annie M. McClellan*, for Defendants-Appellants.

**KINSLEY, Presiding Judge.**

{¶1} Defendants-appellants Abubakar Atiq Durrani, M.D., and the Center for Advanced Spine Technologies, Inc. ("CAST") appeal the judgments of the Hamilton County Court of Common Pleas following jury verdicts in favor of plaintiffs-appellees Lenora Haggard and Thomas Meyers.[1] Haggard and Meyers sued after Durrani performed what they alleged were medically unnecessary back surgeries. The jury awarded them each substantial monetary damages, including punitive damages.

{¶2} On appeal, Durrani raises three assignments of error and a number of separate legal issues, the majority of which we previously addressed in *Courtney v. Durrani*, 2025-Ohio-2335 (1st Dist.), *Ravenscraft v. Durrani*, 2025-Ohio-2900 (1st Dist.), and *Fenner v. Durrani*, 2025-Ohio-4477 (1st Dist.). We accordingly cover little new territory in this opinion.

{¶3} Consistent with *Courtney*, *Ravenscraft*, and *Fenner*, we hold that (1) the trial court did not err in joining the plaintiffs' cases for trial, (2) the trial court properly permitted the testimony of an expert who was actively engaged in clinical practice at the time of plaintiffs' surgeries and the testimony of a radiologist as to how Durrani's surgeries corresponded to radiological findings, but committed harmless error in admitting the deposition testimony of a physician as to Durrani's habits, (3) the trial court did not err in issuing an absent-defendant jury instruction, (4) the trial court did not err in denying Durrani a new trial because plaintiffs did not join their health insurers as parties, and (5) the jury's award of future medical damages was supported by sufficient evidence. We accordingly reject Durrani's arguments as to

---

[1] We sua sponte consolidate Haggard's and Meyers's separate appeals into a single opinion and judgment because the parties raise identical arguments before us. We refer to Durrani and CAST together as "Durrani" unless otherwise indicated. We use the term "plaintiffs" to refer to Haggard and Meyers.

these legal issues. But, relying on our precedent, we agree with Durrani that he was entitled to a setoff of damages based on plaintiffs' settlements with other defendants, and we remand the cause to the trial court to calculate the appropriate setoff amount.

{¶4} In addition, we resolve three new legal issues in this appeal. First, we agree with Durrani that the trial court erred in calculating punitive damages under R.C. 2314.21(D)(2)(b) and that plaintiffs' punitive damages awards against Durrani individually should be reduced to $350,000 per plaintiff. We remand the matter of damages to the trial court to make that adjustment. Second, we reject Durrani's contention that the trial court improperly limited the scope of expert testimony by denying objections to words like "usually" and "these cases." Third, we reject Durrani's contention that he was prejudiced when the trial court prohibited his experts from conducting demonstrations on spinal anatomy.

{¶5} Thus, as we explain in this opinion, we largely affirm the trial court's judgments, remanding only so the trial court can correct its computation of punitive damages and determine the amount of setoff.

### *Background Facts and Procedure*

{¶6} On December 7, 2017, Haggard and Meyers separately filed suit against Durrani and West Chester Hospital/UC Health ("UC Health"), claiming battery, negligence, negligent hiring, fraud, intentional infliction of emotional distress, lack of informed consent, violation of the Ohio Consumer Sales Protection Act, spoilation of evidence, loss of consortium, negligent credentialing, and engaging in a pattern of corrupt behavior.

{¶7} The trial court later consolidated plaintiffs' claims for a jury trial. Before it did so, however, plaintiffs voluntarily dismissed UC Health from each of their cases. Durrani also moved to join Meyers's insurers as subrogated parties but made no

6

similar motion in Haggard's case.

### A. Trial

{¶8} The consolidated jury trial lasted seven days. Haggard, who was 72 years old at the time, testified as to the injuries that led her to be treated by Durrani. Formerly a pharmacy technician who had to lift heavy equipment on the job, Haggard had been diagnosed with fibromyalgia and declared disabled. She officially stopped working in 2007. She experienced pain throughout her back, primarily focused in her lower back, which caused lower back spasms and radiating pain into both legs.

{¶9} Over the years, Haggard had seen several doctors to help manage her pain. She also attempted pain management including injections and physical therapy. Haggard's primary doctor referred her to Durrani in late 2012 or early 2013. When Haggard saw Durrani, she identified her back pain but did not mention her leg pain. Durrani advised that she had a pinched nerve, which he described as an easy "fix." Haggard explained to Durrani that she only wanted surgery as a permanent solution, and he said he could achieve that. Yet, according to Haggard, Durrani never told her what surgery he would perform. He had her schedule surgery during that visit.

{¶10} Durrani operated on Haggard on February 11, 2013. Haggard testified that she never saw Durrani the morning of surgery. In fact, no one talked to her about the procedure or explained what type of procedure she would receive. When she awoke after surgery, Durrani informed her she would be hospitalized overnight for observation. This alarmed Haggard because she expected an outpatient procedure and because Durrani did not explain the basis for her overnight admission.

{¶11} Haggard did not see Durrani again until she went to his office for a post-operative follow-up appointment, at which Durrani prescribed physical therapy. Haggard attended these sessions but eventually stopped because her provider

permanently closed its location.

{¶12} Initially after surgery, Haggard's back felt better. But as she became more active, her pain was worse than before surgery, and she sought care from another doctor. She struggled to fully describe her problems to the new physician because she did not know what surgery Durrani had performed. Before the surgery, Haggard was able to perform simple tasks, like shopping with her granddaughter, grocery shopping, and mopping the floor. But after surgery, she could not go shopping, engage in outdoor work, or even pick up her two-year-old grandson.

{¶13} Meyers also described his experience with Durrani. Like Haggard, Meyers left his place of employment—Cincinnati Bell—because of physical disabilities. Meyers worked at Cincinnati Bell for 23 years before leaving due to back problems, which had plagued him his entire life. Meyers had been a football player and had lifted weights, which exacerbated his back pain, particularly in his lower back at the base of his spine. Although his back issues began early in life, he did not seek medical care for the condition until his late 20s or early 30s.

{¶14} Before seeing Durrani, Meyers sought treatment from numerous doctors and tried injections and physical therapy. When those treatments failed, a different doctor advised that the only possible surgery would be highly invasive, requiring removal of his internal organs to permit a cage to be installed around his spine. After hearing that, Meyers opted out of surgery.

{¶15} Meyers scheduled an appointment with Durrani after reading about him in a magazine. During his first visit, Durrani advised he could correct Meyers's problems with a spinal fusion, which required a series of rods and screws to be placed in Meyers's spine. Like Haggard, Meyers told Durrani he only wanted surgery if it would permanently fix his injuries, and Durrani indicated that it would. In fact,

Durrani told Meyers the surgery would be a "one hundred percent fix." According to Meyers, Durrani also said that Meyers's neck would possibly snap if he declined surgery and that the surgery had no risks. Similar to Haggard's testimony, Meyers testified that Durrani did not advise him as to what type of operation he would be performing.

{¶16} Durrani conducted surgery on Meyers on December 3, 2012. Meyers stayed overnight in the hospital as expected. Durrani visited him the day after surgery but did not tell him how the surgery went.

{¶17} Shortly after the surgery, Meyers's back pain remained constant, but he also began to experience additional pain radiating down both sides of his legs into his thighs and knees. Meyers performed physical therapy following his surgery, which he found painful. He began seeing another doctor once a month for pain management. Since the surgery, Meyers has been unable to perform routine tasks, and the new radiating pain has interfered with his intimacy with his wife.

{¶18} The plaintiffs called four expert witnesses. The first was Dr. Stephen Bloomfield, a 1980 graduate of the Rutgers Medical School and a board-certified neurosurgeon who was employed at New Jersey Neuroscience Center at JFK Hospital. Dr. Bloomfield spent 90 percent of his professional practice in the field of neurosurgery. In his previous role at the Pennsylvania Board of Medicine, he had evaluated complaints against neurosurgeons. Dr. Bloomfield indicated that the standard of neurosurgical care in Cincinnati is similar to the standard of care in every location where he has previously worked. Dr. Bloomfield reviewed plaintiffs' medical records and testified as to whether the surgeries that Durrani performed on each patient were indicated by plaintiffs' medical conditions.

{¶19} In Haggard's case, Dr. Bloomfield opined that she was not a good

9

candidate for surgery and that her discomfort would have been best addressed by a pain management center. In contrast to Durrani's diagnosis, Dr. Bloomfield reviewed Haggard's MRI imaging and opined that there was no real pinching of her nerve. Dr. Bloomfield also reviewed Haggard's informed consent form and determined that it was missing necessary information about the surgery that Haggard actually had— decompression of the central canal with a full laminectomy and decompression of the right-sided neural foramina. He therefore concluded that Durrani made material misrepresentations to Haggard and her insurance company by exaggerating findings on her MRI and by fabricating findings that did not medically exist.

{¶20} Dr. Bloomfield also reviewed Durrani's recommendation to Meyers, which offered him three options (1) live with the pain, (2) epidural steroids, which had showed some effectiveness in the past, or (3) spinal fusion surgery, which Durrani labeled a permanent "fix." Dr. Bloomfield did not agree with any of these recommendations. First, Dr. Bloomfield believed that Durrani had exaggerated Meyers's level of pain. Durrani opined that Meyers suffered from severe leg pain, but his medical records revealed no leg pain at all. Because Meyers did not have leg pain, surgery to correct this problem would not be effective. Dr. Bloomfield also took issue with the surgery Durrani performed to stabilize Meyers's spine, noting that Meyers did not suffer from instability before surgery. Lastly, Dr. Bloomfield also found Meyers's informed consent form to be deficient. While the form correctly identified the spinal fusion procedure Meyers underwent, it was Dr. Bloomfield's opinion that the surgery was not medically necessary. Thus, in Dr. Bloomfield's opinion, Meyers could not consent to a surgery he did not need.

{¶21} Dr. Keith Wilkey, the medical director of spine and neurosurgery at United Health Care, also opined as to the necessity of plaintiffs' surgeries. Dr. Wilkey

attended medical school at Wright State University and later served in the military, earning honors during the Iraq War and completing an Army residency and internship at Brooke Army Medical Center in San Antonio, Texas. Following his time in the armed forces, Dr. Wilkey undertook a spine fellowship at the University of Louisville. A member of the North American Spine Society, the European Spine Society, and the American Academy of Orthopedic Surgeons, Dr. Wilkey has performed tens of thousands of spine surgeries over the course of his medical career.

{¶22} Nonetheless, Dr. Wilkey was not in active clinical practice at the time of trial. He had been performing spinal surgeries in a rural area of Upstate New York but in 2020, during COVID, the governor there cancelled all elective surgeries. He was therefore asked to resign. But he was currently in negotiations to return to the position. Dr. Wilkey testified that, but for this COVID-related gap, he had spent over 50 percent of his professional time in active clinical practice and was doing so at the time he reviewed plaintiffs' cases.

{¶23} In Haggard's case, Dr. Wilkey took issue with Durrani's characterization that her back pain was an easy "fix." Instead, Dr. Wilkey believed that Durrani breached the standard of care by performing surgery on Haggard when her MRIs did not indicate that surgery would be helpful. Dr. Wilkey opined that, following surgery, Haggard will need ongoing treatment for her chronic back problems, including pain management, because the procedure Durrani performed did not resolve her problems. In addition, Dr. Wilkey testified that two components of the surgery Durrani performed on Haggard—the laminectomy and subsequent dural tear—caused scarring around the nerves and nerve roots. This damage, in Dr. Wilkey's opinion, is permanent and will never be resolved.

{¶24} As to Meyers, Dr. Wilkey opined that Durrani breached the standard of

care in treating Meyers by misrepresenting his test results and the findings of radiological images. He further opined that Durrani's surgery aggravated Meyers's preexisting back conditions. As a result, it was Dr. Wilkey's opinion that Meyers will continue to need ongoing pain management treatment following surgery. In addition, Dr. Wilkey highlighted that because Durrani inserted hardware into Meyers's back, Meyers is at risk for adjacent segment deterioration, which occurs within ten years in about a third of patients.

{¶25} Dr. Wilkey supported his testimony by demonstrating spinal anatomy for the jury. For this, he used a skeletal spine model and explained how the parts of the spine fit together. Following Dr. Wilkey's demonstration, the trial court indicated its intention to prohibit other expert witnesses from offering the same demonstration. It accordingly indicated to defense counsel that they should ask any questions they might have about basic spinal anatomy of Dr. Wilkey rather than any forthcoming defense experts. Defense counsel had no such questions.

{¶26} Dr. Ranjiv Saini, a board-certified diagnostic radiologist, also testified for plaintiffs. As he took the stand, Durrani objected under Evid.R. 601(D) to Dr. Saini being offered as an expert on the surgical standard of care, but the trial court overruled the objection. It held that, as a radiologist, Dr. Saini could testify both as to the generalized standard of informed consent for medical procedures, as well as whether the particular surgeries Durrani performed were indicated by plaintiffs' radiological images.

{¶27} Dr. Saini then explained to the jury that he had reviewed both plaintiffs' MRIs, X-rays, surgical notes, and medical files. He opined that Durrani incorrectly identified the source of Haggard's back pain in her medical file at a level of her spine that did not correspond to her radiological images and further that Durrani diagnosed

a condition—moderate foraminal stenosis at the L5-S1 level—that Dr. Saini does not encounter in practice. Dr. Saini also noted that Durrani incorrectly included pain points for Haggard—painful forward flexion and forward extension—that she did not report. Dr. Saini relied on the opinions of numerous other orthopedic surgeons in concluding that Haggard was not a good candidate for surgery and that surgery was contraindicated in her case.

{¶28} Regarding Haggard's informed consent form, Dr. Saini observed that Haggard authorized a different surgery—a type of laminectomy—than Durrani ultimately performed—a foraminotomy and a decompression. As a result, Dr. Saini opined that Durrani's performance fell below the applicable standard of care in obtaining informed consent before surgery. After reviewing Haggard's surgical notes, Dr. Saini was further concerned about Durrani's record-keeping. Durrani's operative notes indicated that he used a patching material consistent with nipping Haggard's nerve root, but his notes did not expressly describe that a nerve was impacted by surgery.

{¶29} As to Meyers, Dr. Saini opined that Durrani misdiagnosed his condition as radiculopathy, an impossibility given that Meyers never reported leg pain. Dr. Saini further criticized Durrani's notes in Meyers's file as nonsensical and exaggerated. He indicated that surgery was unnecessary in Meyers's case, because the cause of his back pain—spondylolisthesis—was stable and not degenerative.

{¶30} Dr. Zeeshan Tayeb, an interventional spine, pain and sports specialist, testified by deposition, over objection, as to his interactions with Durrani. According to Dr. Tayeb, he repeatedly overheard Durrani tell patients that he would "fix" them and that they would be paralyzed if they did not consent to surgery. Another physician, Dr. Shanti, also advised Dr. Tayeb that Durrani was "overaggressive" in performing

surgeries, often failing to attempt more conservative treatments first. Consistent with these interactions, Durrani boasted to Dr. Tayeb about the high number of surgeries he was performing. Durrani's referrals to Dr. Tayeb for treatment would often not comport with what Dr. Tayeb believed to be appropriate.

{¶31} Durrani called two experts, Dr. Derk Purcell and Dr. Paul Edward Kaloostian. Dr. Purcell, the Chief of Neuroradiology at California Pacific Medical Center in San Francisco who is board-certified in both diagnostic radiology and neuroradiology, testified as a neuroradiological expert. He agreed with Durrani's diagnosis that Haggard had significant narrowing, an L4-5 radiculopathy, and a disc herniation with the L4-5 nerve root. In his opinion, Durrani read Haggard's imaging within the standard of care. He reached a similar conclusion with regard to Durrani's diagnosis of Meyers.

{¶32} Dr. Kaloostian, a graduate of the UCLA School of Medicine and a board-certified neurosurgeon, also testified that Durrani performed within the standard of care for both plaintiffs. With regard to informed consent, he indicated that consent may be given either in writing or orally, and he believed both patients sufficiently consented to their surgeries. He also believed surgery was indicated for both plaintiffs, given the failure of earlier conservative treatments.

### *The Verdicts*

{¶33} At the conclusion of the trial, the jury issued verdicts in favor of plaintiffs on all claims. More specifically, the jury found that (1) Durrani was negligent in his care and treatment because he failed to meet the required standard of care; (2) Durrani's negligence proximately caused plaintiffs' harm; (3) Durrani failed to acquire appropriate informed consent; (4) the lack of informed consent proximately caused harm to plaintiffs; (5) Durrani committed battery by performing unnecessary

surgeries; (6) this battery was the proximate cause of harm to plaintiffs; (7) Durrani fraudulently misrepresented the necessity for plaintiffs' surgeries; and (8) the fraudulent misrepresentation proximately caused plaintiffs' harm.

**{¶34}** The jury awarded Haggard $295,000 in compensatory damages, $35,000 in past medical expenses, $60,000 in future medical expenses, $25,000 for past pain and suffering, $75,000 for future pain and suffering, $25,000 for past loss of enjoyment of life, and $75,000 for future loss of enjoyment of life. It awarded Meyers $325,000 in compensatory damages, $70,000 in past medical expenses, $101,000 in future medical expenses, $25,000 for past pain and suffering, $75,000 for future pain and suffering, $2,000 for past loss of enjoyment of life, and $52,000 for future loss of enjoyment of life. The jury also awarded both plaintiffs punitive damage awards of $5 million plus attorney fees.

### *Post-Trial Motions*

**{¶35}** After the jury reached its verdicts, Durrani moved for judgment notwithstanding the verdict ("JNOV") or a new trial. In an initial ruling, the trial court largely denied the motion but ordered that Durrani was not required to pay the plaintiffs' damages for past medical expenses absent a release that ensured it would not pay those amounts to both plaintiffs and their insurers. It also reduced Haggard's punitive damages award from $5 million to $590,000 and Meyers's punitive damages award from $5 million to $650,000. These amounts reflected twice the amount of each plaintiff's compensatory damages award.

**{¶36}** On April 22, 2024, the trial court issued its final judgment on Durrani's

post-trial motions.[2] In that order, it (1) concluded that the admission of Dr. Tayeb's testimony constituted harmless error and did not warrant a new trial, (2) held that an adverse inference instruction it provided to the jury as to Durrani's absence from trial was not in error, (3) denied Durrani's request for a setoff, (4) found that plaintiffs were no longer required to obtain releases from their insurers before receiving payment for past medical expenses, (5) denied plaintiffs' motion for prejudgment interest, (6) apportioned plaintiffs' attorney fee award, and (6) ordered Durrani to pay court costs.

**{¶37}** Durrani appeals.

## *Analysis*

**{¶38}** On appeal, Durrani raises three assignments of error. First, Durrani argues that the trial court erred in trying plaintiffs' claims together, given what he describes as inherent prejudice in joining medical claims for trial. Second, Durrani contends that the trial court erred in denying his JNOV motion based on errors he claimed occurred at trial. Third, he challenges the trial court's denial of the damages-based issues in his JNOV motion. We consider each assignment of error in turn.

### *A. Joint Trial*

**{¶39}** In his first assignment of error, Durrani argues that the trial court erred in joining plaintiffs' cases for trial.

**{¶40}** A trial court may join actions for trial if they involve "common questions of law or fact." *Jones v. Durrani*, 2024-Ohio-1776, ¶ 19 (1st Dist.), citing Civ.R. 42(A)(1)(a). We review a decision to join matters for trial for an abuse of discretion. *Id*. at ¶ 20.

---

[2] The trial court's April 22, 2024 judgment reflects that it was issued to resolve motions filed in March and April of 2024. There were no such motions filed in these cases. No party has assigned this mistake as error.

**{¶41}** Durrani begins by asking us, as he has in several other cases, to overrule our opinion in *Jones v. Durrani*, 2024-Ohio-1776 (1st Dist.), the first appeal involving the trial court's Durrani joint-trial procedure. We expressly declined this invitation in *Courtney*, 2025-Ohio-2335, at ¶ 52 (1st Dist.), and *Ravenscraft*, 2025-Ohio-2900, at ¶ 91 (1st Dist.). We again do so here. *Jones* remains the settled law of this appellate district.

**{¶42}** Durrani also regurgitates arguments he has made before about the inherent prejudice that occurs when different patients' medical claims are tried together. *See, e.g., Ravenscraft* at ¶ 89 ("The Durrani parties claim that the joint trial prejudiced them because Ravenscraft and Bowling each gained strategic advantages due to improper influences raised, and confusion sowed, by evidence of the other's medical history, diagnosis, surgical procedure, and recovery."). But we have rejected this argument multiple times in the past, and we do so now for identical reasons. *See id.* at ¶ 90 (rejecting inherent prejudice argument because jury was instructed to assess each plaintiff's claim on its own merit and reached differing damages awards, suggesting it followed that instruction).

**{¶43}** Lastly, Durrani argues that plaintiffs' cases were not sufficiently similar to present common questions of law or fact under Civ.R. 42(A) that warrant a joint trial. In this regard, Durrani asserts that Haggard and Meyers had little in common with each other beyond having back pain for a prolonged period of time. But this minimizes the degree of commonality in the facts of their cases and in their legal claims. Not only did both plaintiffs experience chronic lower back pain, but both patients failed to be treated with conservative measures provided by other doctors prior to being seen by Durrani. When they finally were treated by Durrani, both plaintiffs had similar experiences. Durrani told both patients he could provide

immediate relief and "fix" them permanently but then failed to provide necessary information about the surgical procedures he planned to perform. As a result, plaintiffs' informed consent forms did not align with the surgeries Durrani actually conducted. On the day of surgery, neither plaintiff saw Durrani before their operations and only briefly saw him afterwards. Both plaintiffs experienced additional pain after Durrani operated on them.

**{¶44}** These common questions of fact required similar expert witness testimony to establish and formed the foundation of similar legal claims against Durrani. As we have held in numerous other cases, this degree of commonality supported the trial court's decision to join the matters for trial. *See, e.g., Jones*, 2024-Ohio-1776, at ¶ 23-25 (1st Dist.); *Courtney*, 2025-Ohio-2335, at ¶ 49 (1st Dist.). We accordingly overrule Durrani's first assignment of error.

### B. Judgment Not Withstanding the Verdict and/or New Trial

**{¶45}** In his second assignment of error, Durrani raises seven issues regarding the trial court's denial of his JNOV motion and motion for a new trial. We review a trial court's decision on Civ.R. 50 JNOV motion de novo. *Hounchell v. Durrani*, 2023-Ohio-2501, ¶ 30 (1st Dist.). Under this standard, we construe the evidence in the light most favorable to the nonmoving party and grant the motion if reasonable minds can come to only one conclusion, which is in favor of the moving party. *Id.* Civ.R. 59 governs motions for a new trial. We review a trial court's decision on a motion for a new trial for an abuse of discretion, construing the evidence in favor of the trial court's ruling rather than in favor of the original jury's verdict. *Id.* at ¶ 31.

### 1. Dr. Wilkey's Testimony

**{¶46}** In challenging the trial court's denial of his JNOV and new trial motion, Durrani first takes issue with the trial court's decision to admit Dr. Wilkey's testimony

under Evid.R. 601(B)(5)(b). At the time of plaintiffs' trial, this rule required a medical expert to spend at least 50 percent of the expert's professional time in active clinical practice or instruction at an accredited school, *as of the time of trial*, to be qualified to testify. *See Courtney*, 2025-Ohio-2335, at ¶ 69 (1st Dist.). But in July 2023, the rule was amended to measure compliance with the practice standard as of "the time the negligent act is alleged to have occurred or the date the claim accrued." Evid.R. 601(B)(5)(b) (effective July 1, 2023). The amended rule applied to actions then pending, which plaintiffs' were. *See Ravenscraft*, 2025-Ohio-2900, at ¶ 113-116 (1st Dist.) (explaining when a case is pending for the purposes of amended Evid.R. 601(B)(5)(b)).[3]

**{¶47}** Dr. Wilkey testified that, prior to the COVID pandemic, he had been working in Upstate New York as a spine surgeon and until then was engaged in active clinical practice for more than 50 percent of his professional time. Dr. Wilkey could have been more specific as to the timeline of his professional activities. But his testimony, which indicated that he was an active clinical practitioner at the time of plaintiffs' surgeries, satisfied the practice standard set forth in amended Evid.R. 601(B)(5)(b).

**{¶48}** The trial court did not err in denying Durrani's JNOV and new trial motion on this basis.

### 2. Dr. Tayeb's Testimony

**{¶49}** Durrani next argues that the trial court erred in admitting Dr. Tayeb's

---

[3] Durrani asks us to overlook the evidentiary standard in Evid.R. 601 and to instead consider Dr. Wilkey's current ability to testify. In doing so, Durrani asserts that Dr. Wilkey was paid by plaintiffs for his testimony on a contingency fee basis and that he is currently in litigation against plaintiffs' counsel in a fee dispute. This information is outside the record in this case, and we accordingly decline to address it. *See State v. Valdez*, 2017-Ohio-4260, ¶ 20 (1st Dist.), citing *Morgan v. Eads*, 2004-Ohio-6110, ¶ 13.

testimony as to what Durrani told his patients about the consequences of declining surgery. He contends this was improper habit evidence under Evid.R. 406. We have agreed in a litany of cases, *see, e.g., Stephenson v. Durrani,* 2023-Ohio-2500, ¶ 37 (1st Dist.); *Densler v. Durrani,* 2024-Ohio-14, ¶ 18 (1st Dist.); *Courtney,* 2025-Ohio-2335, at ¶ 64 (1st Dist.). We agree again now.

**{¶50}** Nonetheless, the trial court's error in admitting Dr. Tayeb's improper habit evidence was harmless. As we noted in *Courtney* at ¶ 65, an evidentiary error only rises to reversible error when it affects the adverse party's substantial rights or is inconsistent with substantial justice. Dr. Tayeb's testimony did not do that here. There is no indication that the jury relied on what Dr. Tayeb said in reaching its verdicts, and plaintiffs themselves testified to similar statements Durrani made in providing their treatment. Faced with similar circumstances, we found the admission of Dr. Tayeb's habit testimony to be harmless error in *Courtney* at ¶ 66, and *Ravenscraft*, 2025-Ohio-2900, at ¶ 107 (1st Dist.). We again find the improper admission of the habit portions of Dr. Tayeb's deposition to be harmless in these appeals.

**{¶51}** Durrani also takes issue with the portion of Dr. Tayeb's deposition in which he relayed Dr. Shanti's opinion that Durrani was overly aggressive in recommending surgery. He argues this is hearsay. But we rejected this identical argument in *Bender v. Durrani*, 2024-Ohio-1258, ¶ 78 (1st Dist.), holding that the testimony was admissible as an admission against interest by a party, as Dr. Shanti was employed by CAST. We affirmed that result in *Courtney* at ¶ 68. Given this authority, we see no error in the trial court's admission of Dr. Tayeb's deposition testimony as to Dr. Shanti.

### 3. Dr. Saini's Testimony

{¶52} Durrani next argues that Dr. Saini's testimony was improperly admitted under Evid.R. 702 because Dr. Saini testified beyond his expertise as a neuroradiologist. More specifically, Durrani contends that Dr. Saini opined on a surgical standard of care, testifying as to the surgical process and surgical notetaking, despite the fact that he himself is not a surgeon.

{¶53} The scope of expert testimony under Evid.R. 702 is a matter vested to the sound discretion of the trial court. *Guiliani v. Shehata*, 2014-Ohio-4240, ¶ 42 (1st Dist.), citing *Celmer v. Rodgers*, 2007-Ohio-3697, ¶ 19. In medical malpractice cases, "a witness need not practice in the exact same specialty as that of the defendant-physician; rather, it is the scope of the witness's knowledge and not the artificial classification by title that should govern the threshold question of his qualifications." (Cleaned up.) *Adams v. Durrani*, 2022-Ohio-60, ¶ 50 (1st Dist.).

{¶54} We have previously elaborated on Dr. Saini's qualifications to testify as an expert in Durrani cases. In *Bender*, 2024-Ohio-1258, at ¶ 84 (1st Dist.), for example, we highlighted that Dr. Saini is not merely a radiologist, but a neuroradiologist with additional training in the brain and spinal cord. We accordingly permitted him to testify that a particular surgery was experimental and that surgery was not medically indicated. *Id.* at ¶ 86-87. In *Ravenscraft*, 2025-Ohio-2900, at ¶ 142-143 (1st Dist.), we allowed Dr. Saini's testimony as to a surgeon's operative reports, because he explained how he consulted these documents in the course of a patient's neuroradiological treatment. And in *Adams v. Durrani*, 2022-Ohio-60, ¶ 60 (1st Dist.), we held that Dr. Saini could opine as to the validity of informed consent, given that the practice of obtaining a patient's informed consent is standard across physicians.

**{¶55}** Dr. Saini testified in a similar fashion in these cases to his testimony in *Bender*, *Ravenscraft*, and *Adams*. He explained his credentials in a nearly identical way. He expressed his opinion that, after reviewing plaintiffs' radiological images, the surgeries Durrani performed were not indicated. Rather than focusing *how* Durrani performed plaintiffs' surgeries, Dr. Saini focused on *whether* Durrani should have operated. This was permissible.

**{¶56}** On one occasion, Dr. Saini testified that Durrani's operative notes deviated from what might have taken place during the surgery. Durrani's notes for Haggard's surgery indicated that he used patching, which is consistent with a spinal leak, but the operative notes did not reflect that a nick—which would cause a spinal leak—occurred. Durrani argues this testimony was outside Dr. Saini's expertise. But we disagree. Dr. Saini routinely interprets operative reports for the purpose of radiological treatment. *See Ravenscraft* at ¶ 142-143.

**{¶57}** We accordingly affirm the trial court's admission of Dr. Saini's testimony.

### 4. Dr. Bloomfield's Testimony

**{¶58}** Durrani next argues that he was prejudiced by certain statements made by Dr. Bloomfield, although he bases his argument on no specific evidentiary rule. Because he references prejudice, we assume he means to advance an argument under Evid.R. 403(A). We review this evidentiary decision for an abuse of discretion.[4] *See Ravenscraft*, 2025-Ohio-2900, at ¶ 97 (1st Dist.).

**{¶59}** Dr. Bloomfield referenced other litigation against Durrani by patients

---

[4] Durrani moved for a mistrial on the basis of Dr. Bloomfield's testimony, which the trial court denied. Durrani does not separately assign as error the trial court's failure to grant a mistrial, so we review this issue for an abuse of discretion as it was preserved in Durrani's JNOV motion.

by speaking about what Durrani "usually does" in "these cases," without otherwise elaborating. Durrani contends that these vague references to "other cases" created a prejudicial impression in the minds of the jury that Durrani was being frequently sued. He relies on our decision in *Stephenson*, 2023-Ohio-2500, ¶ 38-48 (1st Dist.), to support his argument. There, we found prejudicial error under Evid.R. 403 in the admission of a collage of Durrani's deposition testimony. *Id.* But this case is different from *Stephenson*. In *Stephenson*, the plaintiffs elicited evidence from Durrani about five other medical malpractice lawsuits against him, unrelated to their cases, without any context. *Id.* at ¶ 48-49. They further questioned Durrani about his failure to disclose the lawsuits to the medical licensing board. *Id.*

{¶60} In contrast, Dr. Bloomfield only generically testified to Durrani's behavior "in all of these cases" without describing what he meant. He did not specifically identify any other litigation or imply any connection between lawsuits against Durrani and Durrani's ability to practice medicine. Nor did he define what "these cases" were—lawsuits, patients, or something else.

{¶61} Given the generic nature of Dr. Bloomfield's testimony, we cannot say it would have caused any specific prejudice in the minds of the jury. We therefore overrule Durrani's Evid.R. 403 argument.

### 5. *Spinal Anatomy Testimony*

{¶62} Durrani next asserts that the trial court erred in limiting Durrani's experts from testifying as to spinal anatomy. He contends that the trial court prejudiced the ability of his experts to form a rapport with the jury by limiting their ability to demonstrate the spine. Again, Durrani does not identify any particular evidentiary rule that forms the basis of his argument, so we are left guessing as to the legal authority that supports his position. Nor did Durrani proffer into evidence at

trial what his experts would have testified to in this context, so we are unsure what evidence was actually excluded.

**{¶63}** Dr. Wilkey was the second medical expert to testify at trial. He conducted a demonstration for the jury of the human spine using a model of the spine's anatomy. Following that portion of his testimony, the trial court instructed Durrani's counsel that (1) "I'm not going to have doctors jumping up anymore. This is the opportunity to have the spine demonstrated," (2) "your doctor is not going to get up and show the spine again. That's basically what I'm telling you," (3) "We will have one doctor get up and show the anatomy of the spine, period," and (4) "standing up in front of the jury, it's only going to happen once to demonstrate or show them the actual anatomy of the spine." Durrani's counsel clarified,

> **Counsel**: So just so I'm clear, I have to use plaintiffs' expert in order to convey what the testimony that I think is important relative to the spine?
>
> **Court**: No. You don't have to do that. But what I am saying, your doctor will not be standing up in front of the jury with the spine in his hand saying this is this, this is this, this is that. Bottom line.

**{¶64}** We see no error in this limitation. A trial court has the discretion under Evid.R. 403(B) to limit the needless presentation of cumulative evidence. *See, e.g., State v. Chappell*, 2024-Ohio-1541, ¶ 30-32 (7th Dist.) (upholding trial court's exclusion of videos submitted by defendant at trial that were duplicative and cumulative). The trial court merely limited Durrani's experts from duplicative *demonstrations* of basic spinal anatomy using a spinal model. It did not prohibit Durrani's experts from testifying as to Durrani's surgical decision-making and the surgical standard of care. Durrani's argument is overruled.

### 6. Absent-Defendant Jury Instruction

**{¶65}** Durrani next challenges the trial court's issuance of an absent-defendant jury instruction. The trial court instructed the jury here identically to the instruction it provided in *Jones*, 2024-Ohio-1776, at ¶ 30 (1st Dist.); *Courtney,* 2025-Ohio-2335, at ¶ 84-87 (1st Dist.); *Ravenscraft,* 2025-Ohio-2900, at ¶ 130-137 (1st Dist.); and *Fenner,* 2025-Ohio-4477, at ¶ 69-74 (1st Dist.). In each of those cases, we held a portion of the instruction to be erroneous, but deemed the error harmless in the absence of evidence that the jury was actually prejudiced. We do so again here. The record in plaintiffs' cases reflects that the jury was not misled by the trial court's instruction. Rather, it relied on the evidence presented at trial, and not Durrani's absence, in reaching its verdicts. We accordingly find no reversible error in the trial court's absent-defendant instruction.

### 7. Cumulative Error

**{¶66}** Lastly, Durrani asserts that the trial court erred in denying his JNOV motion on the basis of cumulative error. Under the cumulative error doctrine, a judgment may be reversed if the cumulative effect of otherwise harmless errors deprives a party of a fair trial. *Woods v. Rogers*, 2024-Ohio-338, ¶ 51 (8th Dist.).

**{¶67}** We identified two errors that individually were harmless (1) the improper admission of Dr. Tayeb's habit testimony, and (2) the issuance of an erroneous absent-defendant jury instruction. But the cumulative impact of these errors did not deprive Durrani of a fair trial. As we have pointed out, the effect of Dr. Tayeb's testimony was mitigated by plaintiffs' own largely redundant testimony about Durrani's representations to them, and there is no indication the jury relied on Durrani's absence in reaching its verdicts. Over the course of a seven-day trial, these two minor errors did not undermine the fairness of Durrani's proceeding.

25

**{¶68}** We accordingly overrule Durrani's second assignment of error.

### C. Damages

**{¶69}** In his third assignment of error, Durrani argues that the trial court should have granted his motion for JNOV based on errors related to damages. He raises four specific issues. First, he argues that the trial court failed to join plaintiffs' health insurers as necessary parties. Second, he asserts that the trial court erred in awarding plaintiffs' future medical expenses. Third, he contends that the trial court erred in computing punitive damages. Fourth, he asserts that the trial court should have allowed a setoff against plaintiffs' settlement with other tortfeasors.

### 1. Failure to Join

**{¶70}** With regard to damages, Durrani first argues that the trial court erred in failing to join plaintiffs' health insurers as necessary parties under Civ.R. 19.

**{¶71}** In Meyers's case, Durrani preserved the issue by filing a pretrial motion to join Anthem, which the trial court granted. But Anthem never joined, and the trial went forward without Anthem's participation. Durrani raised this argument in his JNOV motion, and the trial court observed that Anthem should have been a party. It initially absolved Durrani of paying the past medical damages award absent a release to protect him from double damages. But in its final JNOV order, it removed this condition based on the representation of plaintiffs' counsel that Anthem had already been paid.

**{¶72}** Haggard's case followed a largely similar path. Haggard was insured by both Medicaid and a private insurer. Durrani did not file a pretrial motion to join the insurers but did orally move to join them the morning of trial. The trial court denied the motion to join Medicaid as an involuntary plaintiff under Civ.R. 19(A) and denied Durrani's request for a continuance of the trial to enable him to join the private

insurer, citing timing concerns. Durrani raised the issue again in his JNOV motion. The trial court initially imposed the same release limitation as it had in Meyers's case. But in its final JNOV order, it removed the condition, as plaintiffs' counsel indicated the private insurer had been paid and had no liens with regard to Meyers's medical expenses.

{¶73} The record contains no independent evidence that we can discern that the insurers were in fact paid. Nonetheless, Durrani does not assign this as error on appeal. Rather, he alleges that the trial court erred in requiring releases before payment of past medical expenses rather than requiring a new trial given the absence of the insurers from trial. We specifically upheld this remedy in *Courtney*, 2025-Ohio-2335, at ¶ 96-97 (1st Dist.). We accordingly overrule Durrani's argument.

## 2. *Future Medical Expenses*

{¶74} For his next argument, Durrani asserts that plaintiffs' evidence was too speculative to support an award of future medical damages.

{¶75} "Future damages are limited to losses which the plaintiff is reasonably certain to incur from the injuries. A plaintiff's claim for future medical expenses must be supported by evidence that reasonably establishes the amount to be incurred in the future." (Cleaned up.) *Setters v. Durrani*, 2020-Ohio-6859, ¶ 40 (1st Dist.).

{¶76} Plaintiffs presented this type of evidence at trial. Haggard testified that her back pain was exacerbated by surgery and that she required ongoing medical care as a result. She continued to see several doctors for this condition. Meyers testified that he required injections in his lower back once a month to treat problems from his surgery. Both plaintiffs submitted medical records demonstrating the need for additional medical treatment and its costs. From these bills, the jury could extrapolate how much each plaintiff's medical care would cost in the future. Furthermore, the jury

calculated future medical expenses for Haggard and Meyers separately, indicating that they took each plaintiff's unique medical expenses into account in awarding these damages.

{¶77} We overrule Durrani's challenge to future medical expenses.

### 3. Punitive Damages

{¶78} Durrani next argues that the trial court erred in computing the punitive damages cap in both Haggard's and Meyers's cases. The jury awarded each plaintiff $5 million in punitive damages. The trial court reduced Haggard's punitive damages award to $590,000 and Meyers's punitive damages award to $650,000—twice the compensatory damages award in each case.

{¶79} Durrani contends that, even with these reductions, the punitive damages awards exceeded those allowed by R.C. 2315.21(D)(2)(b). This subsection applies to small employers employing not more than 100 full-time employees[5] and individuals. It caps punitive damages against defendants in these categories at the lesser of two times the compensatory damages awarded to the plaintiff or ten percent of the employer's or individual's net worth up to a maximum of $350,000.

{¶80} The trial court denied Durrani's JNOV motion on this issue for two reasons. First, the trial court determined that Durrani bore the burden of establishing the net worth component of R.C. 2315.21(D)(2)(b) and that he had failed to present evidence in that regard. Thus, in the absence of evidence from which it could compute the net worth option presented by the statute, the trial court concluded the $350,000 punitive damages cap did not apply. Second, the trial court found the record devoid

---

[5] The definition of a "small employer" is found in R.C. 2315.21(A)(5). Unless the employer is classified as being in the manufacturing sector, an employer qualifies as "small" if it employs under 100 employees.

of evidence that CAST was a "small employer" under R.C. 2315.21(A)(5).

{¶81} We agree with the trial court in part. There is indeed no evidence in the record to support Durrani's argument that CAST is a small employer. While there is very little case law on the matter, courts examining the application of R.C. 2315.21(D)(2)(b) have placed the evidentiary burden of meeting the small business cap on the defendant seeking to invoke it. *See, e.g., Moore v. Schill*, 2019-Ohio-349, ¶ 22 (8th Dist.) (reinstating $25,000 punitive damages award reduced to $0 under R.C. 2315.21(D)(2)(b) by trial court where defendant did not present any evidence of net worth). In the absence of evidence as to CAST's size, CAST has not met its burden of showing that it is entitled to the "small employer" punitive damages cap.

{¶82} But the trial court erred in its reading of R.C. 2315.21(D)(2)(b) as to Durrani, a point plaintiffs conceded at oral argument. The statute permits punitive damages in the *lesser* amount of ten percent of an individual's net worth up to $350,000 or two times compensatory damages, meaning the amount can never exceed $350,000. *See Fenner*, 2025-Ohio-4477, at ¶ 97 (1st Dist.). R.C. 2315.21(D)(2)(b) thus imposes a $350,000 punitive damages cap for individuals. This cap applies to Durrani individually. We accordingly sustain Durrani's challenge to the trial court's computation of punitive damages as to him.

### *4. Setoff*

{¶83} In his final argument, Durrani asserts that he is entitled to setoff plaintiffs' compensatory damages awards with damages awards plaintiffs collected from other defendants, i.e., UC Health. Durrani is correct.

{¶84} In *Fenner*, we held that even intentional tortfeasors are entitled to setoff under R.C. 2307.28(A). *Fenner* at ¶ 128. Our precedent had distinguished between intentional and unintentional tortfeasors in determining the applicability of the setoff

rules. *Id.* at ¶ 115. But we overruled that precedent in *Fenner* for the purpose of insuring that plaintiffs do not receive double recovery. *Id.* at ¶ 127.

**{¶85}** Our holding in *Fenner* applies with full force here. The record reflects that plaintiffs recouped settlements from hospital system defendants, but the amounts are confidential. We accordingly sustain Durrani's argument as to setoff and return the matter to the trial court to ascertain the amount of setoff to which Durrani is entitled.

**{¶86}** Durrani's third assignment of error is therefore sustained in part and overruled in part.

### *Conclusion*

**{¶87}** As explained in this opinion, we sustain Durrani's third assignment of error in part, reverse the punitive damages awards against Durrani individually and the trial court's denial of setoffs, and remand the cause to the trial court with instructions to both calculate the amount of setoff in each of plaintiffs' cases and to reduce the punitive damages awards against Durrani individually to $350,000. We affirm the trial court's judgments in all other respects.

Judgments affirmed in part, reversed in part, and cause remanded.

**BOCK** and **NESTOR, JJ.,** concur.