[Cite as *Boggs v. Durrani*, 2026-Ohio-210.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| KAITLYN BOGGS, : | APPEAL NO. | C-250068 |
| | TRIAL NO. | A-1700307 |
| Plaintiff-Appellee, : | | |
| vs. : | | |
| ABUBAKAR ATIQ DURRANI, M.D., : | | |
| and : | | |
| CENTER FOR ADVANCED SPINE : TECHNOLOGIES, INC., | | |
| : | | |
| Defendants-Appellants, : | | |
| and : | | |
| WEST CHESTER HOSPITAL, LLC, : | | |
| UC HEALTH, : | | |
| and : | | |
| CHILDREN'S HOSPITAL MEDICAL : CENTER, | | |
| : | | |
| Defendants. : | | |

| | | |
|---|---|---|
| AMANDA KOCH, : | APPEAL NO. | C-250072 |
| | TRIAL NO. | A-1806348 |
| Plaintiff-Appellee, : | | |
| vs. : | | |
| ABUBAKAR ATIQ DURRANI, M.D., : | | |
| and : | | |
| CENTER FOR ADVANCED SPINE : TECHNOLOGIES, INC., | | |

# OHIO FIRST DISTRICT COURT OF APPEALS

Defendants-Appellants,                    :

and                                       :

WEST CHESTER HOSPITAL, LLC,                :

UC HEALTH,                                 :

and                                       :

CHILDREN'S   HOSPITAL   MEDICAL   :
CENTER,

                                          :
        Defendants.

                                          :

---

EDDIE STALLINGS,                           :          APPEAL NO.    C-250275
                                                       TRIAL NO.     A-1706456
        Plaintiff-Appellee,                :

and                                       :

AIKO STALLINGS,                            :          *JUDGMENT ENTRY*

        Plaintiff,                         :

vs.                                       :

ABUBAKAR ATIQ DURRANI, M.D.,               :

and                                       :

CENTER   FOR   ADVANCED   SPINE   :
TECHNOLOGIES, INC.,

                                          :
        Defendants-Appellants,

                                          :
and

                                          :
WEST CHESTER HOSPITAL, LLC,

                                          :
and

                                          :
UC HEALTH,

                                          :
        Defendants.

                                          :

This cause was heard upon the appeals, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgments of the trial court are affirmed in part and reversed in part, and the cause is remanded.

Further, the court holds that there were reasonable grounds for these appeals, allows no penalty, and orders that costs be taxed 50 % to Appellants and 50 % to Appellees.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 1/23/2026 per order of the court.**

**By:**_____

     **Administrative Judge**

[Cite as *Boggs v. Durrani*, 2026-Ohio-210.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| KAITLYN BOGGS, | : | APPEAL NO. C-250068 |
| | | TRIAL NO. A-1700307 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| ABUBAKAR ATIQ DURRANI, M.D., | : | |
| and | : | |
| CENTER FOR ADVANCED SPINE TECHNOLOGIES, INC., | : | |
| | : | |
| Defendants-Appellants, | : | |
| and | : | |
| WEST CHESTER HOSPITAL, LLC, | : | |
| UC HEALTH, | : | |
| and | : | |
| CHILDREN'S HOSPITAL MEDICAL CENTER, | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| AMANDA KOCH, | : | APPEAL NO. C-250072 |
| | | TRIAL NO. A-1806348 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| ABUBAKAR ATIQ DURRANI, M.D., | : | |
| and | : | |
| CENTER FOR ADVANCED SPINE TECHNOLOGIES, INC., | : | |
| | : | |

Defendants-Appellants,                    :

and                               :

WEST CHESTER HOSPITAL, LLC,               :

UC HEALTH,                            :

and                               :

CHILDREN'S HOSPITAL MEDICAL               :
CENTER,                            :

Defendants.                         :

---

EDDIE STALLINGS,                       :        APPEAL NO.    C-250275
                                              TRIAL NO.     A-1706456
Plaintiff-Appellee,               :

and                               :

                                               *O P I N I O N*
AIKO STALLINGS,                       :

Plaintiff,                      :

vs.                               :

ABUBAKAR ATIQ DURRANI, M.D.,              :

and                               :

CENTER FOR ADVANCED SPINE :
TECHNOLOGIES, INC.,

                                      :
Defendants-Appellants,            :

and                               :

WEST CHESTER HOSPITAL, LLC,               :

and                               :

UC HEALTH,                            :

Defendants.                         :

                                      :

# OHIO FIRST DISTRICT COURT OF APPEALS

Civil Appeals From: Hamilton County Court of Common Pleas

Judgments Appealed From Are: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: January 23, 2026

*Statman Harris, LLC*, and *Alan J. Statman*, for Plaintiffs-Appellees Kaitlyn Boggs, Amanda Koch, and Eddie Stallings,

*Taft Stettinius & Hollister LLP*, *Philip D. Williamson, Aaron M Herzig, Russel S. Sayre* and *Taylor S. Lovejoy*, for Defendants-Appellants Abubakar Atiq Durrani, M.D., and Center for Advanced Spine Technologies, Inc.

**MOORE, Judge.**

{¶1}    Defendants-appellants Dr. Abubakar Atiq Durrani and the Center for Advanced Spine Technologies, Inc., ("CAST") (collectively, "Durrani"), appeal the Hamilton County Court of Common Pleas' judgments in favor of plaintiffs-appellees Kaitlyn Boggs, Amanda Koch, and Eddie Stallings (collectively, "plaintiffs"). Following a two-week trial, the jury found in favor of plaintiffs on their claims of, inter alia, battery, negligence, fraud, and lack of informed consent regarding the surgeries that Dr. Durrani performed on them, which plaintiffs asserted were unnecessary. Durrani has appealed. This court has consolidated the appeals for purposes of argument and opinion.

{¶2}    Durrani now raises four assignments of error. First, Durrani alleges that the court erred in consolidating the plaintiffs' cases for trial. Second, Durrani contends that the court erred when it denied Durrani's motion for a judgment notwithstanding the verdict ("JNOV") and asserts that the trial court committed several evidentiary errors. Third, Durrani argues that the court erred by denying their JNOV motion regarding their challenge of the jury's awards for future medical damages. Under the third assignment of error Durrani argues they were entitled to a set-off based on plaintiffs' settlements with other tortfeasors. Fourth, Durrani insists that the court erred in granting a prejudgment-interest award.

{¶3}    For the reasons set forth below, only Durrani's arguments concerning their entitlement to a set-off are meritorious. Therefore, the judgments of the trial court are affirmed in part and reversed in part, and the cause is remanded for the limited purpose of the trial court determining the proper amount of the set-off on plaintiffs' damages award based on plaintiffs' settlements with other tortfeasors.

### *I. Factual and Procedural History*

### *A. Pretrial Motions*

**{¶4}** All three plaintiffs settled their claims against West Chester Hospital and UC Health. Boggs and Koch also settled with Cincinnati Children's Hospital Medical Center ("CCHMC"), which was not a named defendant in Stallings's suit.

**{¶5}** In December 2022, plaintiffs moved to consolidate their cases for the purposes of trial, pursuant to Civ.R. 42(A). Plaintiffs' motion alleged that their cases presented common questions of law and fact—given that all three cases stated claims of negligence and fraud—and that all three suits alleged that Dr. Durrani misread radiography results and mislead the plaintiffs into undergoing unnecessary and dangerous procedures along the same area of the spine, which caused each plaintiff permanent damage. Plaintiffs asserted that consolidation would further judicial economy, avoid undue delays, and mitigate the cost of duplicative trials.

**{¶6}** Durrani responded that consolidation would permit prejudicial evidence to be admitted. Durrani further argued that the facts of these cases were sufficiently distinct. Specifically, Durrani points out a number of distinctions among plaintiffs as it relates to their personal and medical histories. Koch was in her late teens when Dr. Durrani operated on her L4-L5 vertebrae, and the cause of Koch's back problems was unexplained. Koch twice became pregnant and had children around the time of her second and third surgeries, which complicated her recovery. While Boggs was also a teenager, she was the only patient to have a procedure done on her L3-L4 vertebrae and her pain was linked to physical conditioning from cheerleading. Stallings was 75 years old at the time of his surgery and required specific procedures unique to him. Durrani argued that many of Stallings's issues were age-related disc degeneration and were readily distinct from Boggs's and Koch's issues.

8

**{¶7}** During a pretrial hearing, the court granted plaintiffs' motion to consolidate their trials, and a jury trial commenced in January 2023.

### 1. *Durrani's Motion in Limine*

**{¶8}** Plaintiffs sought to introduce several experts. In response, Durrani filed a motion in limine, requesting that the trial court preclude the testimony of plaintiffs' experts. Specific to this appeal, Durrani challenged Dr. Keith Wilkey's opinion on Dr. Durrani's background and qualifications, Dr. Zeeshan Tayeb's testimony as hearsay, evidence regarding past medical expenses based on plaintiffs' failure to join their respective insurers, testimony of Dr. Ranji Saini and Dr. Wilkey on the surgical standard of care based on Durrani's argument that they were not qualified experts, and the cumulative testimony of Drs. Saini, Wilkey, Stephen Bloomfield, and Charles Mehlman. Durrani also filed a motion to strike Dr. Bloomfield's entire videotaped deposition, or in the alternative, that at least portions of his testimony be barred.

**{¶9}** At the conclusion of voir dire, the trial court heard arguments on Durrani's motion in limine. The parties agreed that they would make objections and arguments to Dr. Tayeb's testimony after the parties had filed their designations on what portions of Dr. Tayeb's testimony would be played.

**{¶10}** As to Dr. Wilkey's qualifications to testify as an expert, the trial court stated that his testimony in a previous trial involving Durrani as to Dr. Wilkey's clinical work teaching medical students at Wright State University and supervising another doctor treating orthopedic patients at Five Rivers Health Center would meet the requirement under Evid.R. 601(B), which requires that a medical expert devote 50 percent of his or her professional time to either teaching or the active clinical practice of medicine in the same or substantially similar specialty as a defendant or some combination of teaching and clinical practice. The court noted that a witness who met

these qualifications at the time the negligence was alleged to have occurred is a qualified expert under Evid.R. 601(B)(5). The court, however, reserved its decision on whether to permit Dr. Wilkey to testify until after the conclusion of Dr. Wilkey's voir dire examination.

{¶11} The trial court concluded that Dr. Saini was qualified to testify as an expert based on this court's previous holdings. The court disagreed with Durrani's argument that the testimonies of plaintiffs' experts would be cumulative. The court did strike portions of Dr. Bloomfield's deposition.

### B. Settlement Offers and Demands

{¶12} Counsel for plaintiffs informed the court that plaintiffs had made a $500,000 settlement demand in each of their respective cases. On the next trial date, Durrani informed the court that it had made a global offer to all the Durrani plaintiffs, which was rejected, and that Durrani would not be "look[ing] at anything individually."

### C. Plaintiffs' Testimony

#### 1. Boggs's Family Testimony

{¶13} Kaitlyn Boggs testified that her back injury occurred while cheerleading. Boggs explained that she had undergone a total of three surgeries, and her second and third surgeries were done at CAST. Her initial surgery was done by Dr. Durrani at the CCHMC on the L5 and S1 vertebrae to address the pain in her lower back and left leg. During the second surgery, Dr. Durrani performed a fluoroscopy and an endoscopic discectomy at the L4-L5 vertebrae on the right side of Boggs's spine. During the third surgery, Durrani performed a foraminotomy and discectomy at the L3-L4 and L4-L5 on the left side of Boggs's spine.

{¶14} Boggs testified that she continued to be treated by Dr. Durrani after he

left CCHMC and began practicing at CAST. Her first visit with Dr. Durrani at CAST was an April 2009 follow-up visit after her first surgery. She testified that the first surgery was successful as she had no "left-sided symptoms" at that time.

{¶15} Boggs testified that she went back to Dr. Durrani in July 2009 and reported "having some pain in [her] right side," which was still present when she saw Dr. Durrani for a visit in April 2010. She testified that, at that point, she was experiencing "a dull aching pain" and then a "shooting pain" that went through her outer thigh and then "kind of skipped [her] calf and went to [her] foot."

{¶16} Boggs testified that Dr. Durrani advised her that he would "take care of the discs" and cut out the part that was pushing the nerve, which would "take the symptoms away," and "[she]'ll be fixed." Boggs did not recall Dr. Durrani reviewing her magnetic resonance image ("MRI") or the radiology report or discussing either with her. Boggs recalled that Dr. Durrani recommended surgery, and he offered no alternative treatment. Boggs further stated that Dr. Durrani advised that she had degenerative disc disease "that was going to work its way up [her] spine" and that she had another herniated disc above the area on her spine where Dr. Durrani had previously operated. Boggs testified that Dr. Durrani explained that the surgery that he was recommending "was more innovative and [was a] simpler solution compared to the first surgery that [she] had [undergone] to alleviate the symptoms." She stated that Dr. Durrani also advised her that the second surgery would entail a "very simple, small scar" and the recovery would be "quick."

{¶17} Boggs testified that she relied on Dr. Durrani's advice because, based on the success of the first surgery, she had no reason to question him. She explained that she did not receive much or any relief as compared to her first surgery, as reflected in the two-week postoperative notes written by Dr. Durrani's physician's assistant, who

tended to see Boggs postoperatively instead of Dr. Durrani.

{¶18} Boggs testified that, during her two-week postoperative visit with Dr. Durrani, she reported recurring pain that radiated down her right leg. She stated that Dr. Durrani again did not discuss her MRI images or the radiology report with her but advised her that she had "again herniated another disc at the next level up, which kind of supported the whole degenerative disc disease" that Dr. Durrani advised would work its way up her spine and cause her to need to keep having surgeries "forever." Boggs testified that this was the only explanation that she received regarding her prognosis when he recommended that she have a third surgery.

{¶19} Boggs testified that she was never offered epidural steroids until she saw a different doctor at a different practice years after being treated by Dr. Durrani, nor did Dr. Durrani recommend any other kind of conservative nonoperative care. Boggs testified that she relied on Dr. Durrani in deciding whether to have the second and third surgeries and she had the surgeries because he told her that he was going to be able to "fix and take away [her] symptoms." She testified that she felt like Dr. Durrani lied to her about her available options.

{¶20} Boggs testified that she has continued to experience pain since her procedures. Records indicate that she received prescriptions for pain, that she received an epidural, and that her doctor instructed her to come back for future epidurals as required. Boggs has also been treated by a chiropractor to manage her pain.

{¶21} On cross-examination, Boggs refuted any suggestion that Dr. Durrani discussed the option of undergoing an epidural steroid injection, or any knowledge of what tool Dr. Durrani would use in performing the second surgery on her back. When asked whether she understood that she was guaranteed "pain-free existence" after the surgery, Boggs responded, "His words were that he was going to take away my

symptoms. To me, that would tell me he was going to take away my symptoms."

{¶22} Boggs's father, Timothy Boggs, testified that Boggs's symptoms improved short-term after the surgeries. He also testified that Dr. Durrani's recommendation of surgery over the epidural was not based on Boggs's fear of needles. However, her fear of needles was considered by the family in their discussions regarding the best course of treatment for Boggs. Timothy Boggs testified that Dr. Durrani told him, Boggs, and Boggs's mother, Martha Henderson, that having the surgery would fix Boggs's pain.

{¶23} Ms. Henderson testified that Dr. Durrani was "dismissive" of epidurals or "any other therapies beside surgery" and that he was "very adamant" that Boggs would get progressively worse and would need to have more surgeries, and "the surgery was really the only thing that was going to fix it." Ms. Henderson further testified that Dr. Durrani advised them that Boggs would never get the feeling back in her foot, she would always have numbness and be dragging her foot, and failure to get the surgery could cause paralysis. Ms. Henderson testified that she trusted Dr. Durrani and was terrified that Boggs would end up paralyzed if she did not have surgery.

{¶24} Ms. Henderson explained that sometime around April 2011, Dr. Durrani advised that Boggs had another herniated disc which would continue to work its way up Boggs's spine. Ms. Henderson explained that she "was extremely conservative and wanted to avoid pain medicine and surgery" and "if [they] could try anything conservative, [she] was all for that and asked about that." Ms. Henderson testified that Dr. Durrani advised them that Boggs "would be good as new, that [the surgery] would fix the problem." She testified that, but for the representations that Dr. Durrani made regarding Boggs's prognosis, she would not have allowed Boggs to go through with the surgeries.

*2. Amanda Koch's Testimony*

{¶25} Koch testified that Dr. Durrani performed her first surgery at CCHMC in 2007, and she had a follow-up visit with him after he went to CAST in 2009 as she was having pain. An MRI was done at CAST in July 2010, images which Koch testified she had not seen until trial. A letter written by Dr. Durrani and sent to Koch's primary care physician was presented in open court. The letter stated that Koch had experienced right leg pain and that she had received epidural injections and undergone physical therapy. Koch testified that the location of pain described in the letter was incorrect and refuted Dr. Durrani's claim that she received any epidural injections other than the shots she received in 2007, before her first surgery. Koch also clarified that she had not done physical therapy at that point, and the last time she did physical therapy was when she was treated at CCHMC.

{¶26} In 2010, Koch returned to Dr. Durrani at CAST, who wanted her to have another MRI. Koch testified that her insurance would not permit another MRI until she did physical therapy, so she did two or three sessions of physical therapy to get the MRI approved but never completed a "full regiment of physical therapy or injections" prior to having the second surgery. In September 2010, Dr. Durrani performed a lumbar microdiscectomy and a lumbar laminectomy along Koch's L4-L5 vertebrae.

{¶27} Koch testified that she asked Dr. Durrani if he could make her "normal" again as far as being able to walk normally. Koch testified that Dr. Durrani told her that the surgery would fix her numbness, she would be without pain, and it would make her "normal." Koch explained that she had the surgery after Dr. Durrani told her the surgery would resolve her ailments.

{¶28} Dr. Durrani performed the second surgery, a microdiscectomy, on Koch's left side at the L4-L5 vertebrae in September 2010. Koch testified her pain had

intensified over the two weeks after the surgery, and it was no longer isolated to her left leg, but now radiated down both legs.

{¶29} Koch testified that, because she had become pregnant after the second surgery, Dr. Durrani recommended physical therapy and that she see Dr. Tayeb for pain management. Koch testified that her pain had not improved after receiving epidural injections, which she received between January 2012 and April 2012. Koch refuted Dr. Durrani's notation that she had new onset pain in her lower right extremity, explaining that her pain was in both legs and stemmed from the previous surgeries.

{¶30} Koch testified that Dr. Durrani recommended a third surgery because she was not receiving relief from the injections. She testified that Dr. Durrani advised her that her pain would get worse without surgery, she could end up having a spinal fusion, and her scar would get worse. Koch was already self-conscious of the scar due to its size and the way it would bulge out from her back. Koch underwent the third spinal surgery in August 2012. The third surgery included a lumbar hemilaminectomy, lumbar foraminotomy, and lumbar lateral recess decompression, all bilateral and along the L4-L5 vertebrae.

{¶31} After the third surgery, Koch again received pain-management treatment from Dr. Tayeb, which did not include opioids as Koch developed an addiction to them when they had previously been prescribed. Koch testified that she "felt like an idiot" because she allowed "somebody to say that they were going to take away the pain and the numbness multiple times, and here [she was] and it's still there." Koch asserted that Dr. Durrani's notation that she was doing very well was false, and her left leg never completely recovered.

{¶32} Koch testified that, prior to having the third surgery, her mother asked

15

Dr. Durrani about alternatives to surgery, which he "kind of brushed under the rug" and was "more adamant" that surgery needed to be done. In response to defense counsel's questions about whether Dr. Durrani recommended conservative treatment, Koch stated that Dr. Durrani advised her that because her body did not respond well years ago, "[w]hy would it now," and Dr. Durrani advised that the proper treatment was "surgery, surgery, surgery."

{¶33} Koch testified that life after surgery has remained a challenge. She explained that she has experienced day-to-day challenges and limitations that kept her from doing activities she was previously able to do. Koch stated that her pain has persisted, and that she has been in a pain-management program for several years.

### 3. Eddie Stallings's Testimony

{¶34} Stallings testified that he initially had back surgery in 2005 after having back problems. He engaged in postsurgical therapy and took medication to manage the pain. Stallings testified he was taking pain medication when he reinjured his back in July 2012 while lifting a heavy cooler, which exacerbated his pain. Stallings explained that his doctors treated him with medication, and when he returned in August 2012 still complaining of pain, his doctors referred him to Dr. Durrani. Stallings did not recall whether he did physical therapy at that point.

{¶35} Stallings testified that he informed Dr. Durrani that his pain was on the lower right side of his back, in his back, and in the upper thigh and calf region of his right leg. Stallings stated that the handwriting on the CAST intake form, which indicated that he had been having this pain since 2005, was not his and that the pain he was seeing Dr. Durrani for was worse than the pain he was experiencing prior to lifting the heavy cooler.

{¶36} Stallings explained that he only had injections done after Dr. Durrani

performed surgery on him. Stallings testified that Dr. Durrani told him that "he saw the problem, and he can fix it." Stallings further testified that Dr. Durrani did not review his MRI images with him or go into specifics of his ailment. Dr. Durrani performed an L4-L5 discectomy on Stallings in January 2013. In January 2013, Dr. Durrani removed a preexisting lumbar hardware device at Stallings's L4-L5 vertebrae and performed a lumbar laminectomy with bilateral lateral recess decompression, a lumbar spinal instrumentation, and a lumbar spinal fusion in that region.

{¶37} Stallings testified that he agreed to have the surgery because Dr. Durrani told him that he could fix him. He stated that Dr. Durrani did not offer alternative treatment. Stallings explained that the preoperative notes were incorrect as he never had epidural steroid injections prior to the surgery that Dr. Durrani performed on him. He added that the report incorrectly stated that he responded well to medications because Dr. Durrani never offered him medications and never discussed medications, physical therapy, or epidural injections prior to performing surgery on him.

{¶38} Stallings testified that he felt like Dr. Durrani lied to him about his need for surgery and lied by omission by failing to advise him of nonsurgical treatment options. As with Boggs, Stallings testified that the "number one" thing that Dr. Durrani told him that made him agree to have surgery was that Dr. Durrani could "fix" the problem. And like Boggs and Koch, Stallings testified that he has continued to experience pain because of Dr. Durrani's procedures, and that he has incurred costs because of the procedures and anticipates future medical costs to continue to accrue into the future.

### D. Plaintiffs' Expert Testimony

#### 1. Voir Dire of Dr. Keith Wilkey

{¶39} Dr. Wilkey testified that, since November 2022, his work hours

averaged 20 hours per week at United Healthcare where he evaluated requests for coverage of medical services, which was not clinical work. Dr. Wilkey stated that he volunteered nine hours on Mondays seeing patients with a fellowship-trained sports-medicine doctor who was training in orthopedics at Five Rivers Health Center, he had been an associate professor teaching medical students two to three days per month until November 2022, he was building an orthopedic practice, and he worked with Miami Valley Hospital arranging the transfer of patients to the practice that he was building. Dr. Wilkey added that building a practice is a part of clinical practice. He further explained that he was not teaching medical students at the time of trial because the students were on winter break, he had been working around 15 hours per week preparing lectures for students in addition to the two to three days per month he was teaching prior to the winter break, and he would be teaching again after he returned from vacation.

### 2. *Dr. Keith Wilkey's Testimony*

{¶40}  Dr. Wilkey testified that Dr. Durrani's medical decisions pertaining to plaintiffs fell below the applicable standard of care. Dr. Wilkey also testified on the issue of future medical expenses for each plaintiff. As for Boggs, Dr. Wilkey testified that he knew that Boggs was consulting with two surgeons on two different corrective procedures, that she would need the respective procedures, and that there was a 30 percent likelihood that one procedure would be necessary and the likelihood of the other—a complete facetectomy requiring a two-level fusion—was greater than 50 percent. Dr. Wilkey testified that the latter would rise to the level of a medical certainty and would cost anywhere from $150,000 to $300,000. As to pain management, Dr. Wilkey also testified that while he was not sure what Boggs's physician had ordered for her, Boggs would need ongoing pain-management treatments for the rest of her

life. Dr. Wilkey admitted he was not sure what treatment Boggs was undergoing but explained that if she was receiving injections for pain, "that can be upwards of $20,000 to $100,000 per year."

**{¶41}** As to Stallings and Koch, Dr. Wilkey testified that, like Boggs, both plaintiffs would face similar pain-management costs and may also need similar corrective surgeries with the accompanying expenses in the future, which could total more than hundreds of thousands of dollars. Dr. Wilkey did not specifically address whether Stallings or Koch was engaged in pain-management treatment or was receiving or had plans to receive injections at the time of trial. Dr. Wilkey also testified that Stallings would endure additional costs related to his decreased mobility. Specifically, given that his ability to walk for any extended duration had been compromised, he will need a mobility scooter if he were required to walk for more than 15 minutes.

### 3. Dr. Zeeshan Tayeb's Testimony

**{¶42}** The trial court permitted plaintiffs to read Dr. Tayeb's deposition transcript into the record at trial over Durrani's continued objection that the deposition contained inadmissible hearsay.

**{¶43}** Dr. Tayeb explained that he worked at CAST for three years as the pain-management physician, and he heard Dr. Durrani tell patients that he would "fix them" during the first few weeks when he shadowed Dr. Durrani. Dr. Tayeb testified that "here and there" he overheard Dr. Durrani tell patients that they could be paralyzed if they did not undergo the surgery that he recommended.

**{¶44}** Dr. Tayeb explained that, outside of CAST's lone physical therapist, he was the only conservative-treatment provider at CAST. Despite Dr. Durrani's notations in the patients' preoperative and postoperative notes that those patients

"underwent conservative measures or failed conservative measures," Dr. Tayeb testified that he never worked with Boggs, Koch, or Stallings. Dr. Tayeb stated that he saw that Dr. Durrani was performing "quite a bit of surgery," which made him wonder "where's the conservative management taking place?"

{¶45} Dr. Tayeb indicated that there were instances where Dr. Durrani was not getting the patients "back to baseline before setting up a second surgery, or maybe even a third or fourth." He added that it "always seemed like there was this push for surgery as opposed to looking for" conservative treatment. When asked whether Dr. Durrani ever coerced patients into having surgery, Dr. Tayeb responded, "Well, you tell a person that they're going to be paralyzed or they're not going to walk again, I would think you're basically telling that person, you need to do this."

{¶46} Dr. Tayeb testified that he witnessed Dr. Durrani's exaggeration of spinal stenosis firsthand and discussed the same with Dr. Nael Shanti, another doctor who worked at CAST at the time. Dr. Tayeb explained the process of determining the severity of spinal stenosis—that each image should be reviewed because "you're actually not supposed to make a call based off looking at one slice"; in other words, the images of a spine are taken in "slices" and a doctor can "make it say whatever you want" if he or she only looked at one slice, so reviewing each slice was necessary to make an accurate call as to the severity of spinal stenosis. Dr. Tayeb further explained that Dr. Durrani's dictated notes would deem a stenosis "moderate to severe" while Dr. Tayeb or Dr. Shanti would review various images of the spine and conclude the spinal stenosis was "mild to moderate."

{¶47} Dr. Tayeb testified that the common theme in Dr. Durrani's conversations with patients was "severe stenosis," which he would advise that conservative management could help, but surgery would fix the problem. Dr. Tayeb

stated that "a good percentage" of Dr. Durrani's patients would "go towards surgery, or he would recommend surgery."

{¶48} Defense counsel read designated portions of Dr. Tayeb's deposition into the record, which reflected that (1) Dr. Tayeb shadowed Dr. Durrani during Dr. Tayeb's first couple of weeks at CAST, (2) he was not in the room when Dr. Durrani made those statements to the patients, (3) Dr. Tayeb was not a surgeon nor did he assist Dr. Durrani with surgery, and (4) Dr. Tayeb admitted that it was not his role to assess whether surgery was necessary.

*4. Dr. Ranjiv Saini's Testimony*

{¶49} Dr. Saini, a teleradiologist, neuroradiologist, and diagnostic radiologist, testified to reviewing the imaging and radiology reports in Boggs's, Koch's, and Stallings's cases. The portions of Dr. Saini's testimony that Durrani challenges on appeal were specific only to Boggs's case. In testifying to his evaluation and opinion of the transforaminal lumbar interbody fusion ("TLIF")[1] that Dr. Durrani performed on Boggs, Dr. Saini explained why he needed to know the technique of performing it, stating, "You have to understand what a surgeon is trying to do to be able to help them," which entailed helping the surgeon "to know whether they're doing the right thing and what is supposed to be normal." Dr. Saini added, "Like if they do a normal TLIF, you expect to see fusion within six months to a year. And because you're trying to create solid bone between them, you're supposed to have posterior spinal fusion and anterior spinal fusion so that the two vertebral bodies are not moving." Dr. Saini also

---

[1] A transforaminal lumbar interbody fusion is a procedure performed to relieve chronic lower back pain that happens when intervertebral discs put pressure on the spinal nerves by replacing damaged discs with bone grafts that create new bone to help fuse or join the vertebrae. *See* Cleveland Clinic, *Transforaminal Lumbar Interbody Fusion (TLIF)* https://my.clevelandclinic.org/health/procedures/transforaminal-lumbar-interbody-fusion-tlif (accessed November 10, 2025) [https://perma.cc/C9GG-UPTA].

explained that his duties entailed reviewing fluoroscopy—the X-ray that is used during surgery to ensure instruments are properly placed—and studying the computed tomography scan ("CAT scan") to determine whether there has been a union or nonunion at the spinal fusion site.

**{¶50}** Dr. Saini testified that Dr. Durrani fabricated presurgical notes in Boggs's case. Dr. Saini explained his opinion of the presurgical radiology report that Dr. Durrani prepared prior to performing Boggs's second surgery at CAST. Boggs had reportedly complained of gluteal pain, and Dr. Saini pointed to Dr. Durrani's failure to mention that there was a screw that extended beyond the anterior margin of the S1 vertebrae, which was "not excellently placed" during Boggs's first surgery and could have been touching a blood vessel. Dr. Saini testified that Dr. Durrani, however, noted "excellent placement of the hardware." This testimony was elicited after Dr. Saini stated that, from his review, Dr. Durrani's radiology reports were often fabricated or exaggerated, and surgery was unnecessary. Dr. Saini added that Dr. Durrani's note that Boggs's hardware was excellently placed was an exaggeration.

**{¶51}** Dr. Saini testified that, in the radiology report on an MRI done two years after Boggs's TLIF surgery, Dr. Durrani contradicted the reading radiologist's interpretation by stating that the neural foramina were "severe" where the radiologist determined that it was "patent" or open. Dr. Saini testified that calling it "severe" was a breach of the standard of care. He further explained that a postoperative radiology report revealed that Dr. Durrani operated at Boggs's L5-S1 vertebrae when surgery was supposed to be done at the L4-L5.

### E. Durrani's Experts' Testimony

#### 1. Dr. Paul Edward Kaloostian

**{¶52}** Dr. Paul Kaloostian, a neurosurgeon familiar with procedures involving

22

the spine and the peripheral nerves, testified that Dr. Durrani's care did not breach the standard of care. Dr. Kaloostian emphasized that Dr. Durrani's interpretation of MRI imaging focused on the appropriate abnormalities, and correctly recommended surgery when conservative care failed. Similarly, Dr. Kaloostian testified Dr. Durrani only proceeded upon receiving the plaintiffs' informed consent. Similarly to his belief that Dr. Durrani's preoperative conduct did not breach the standard of care, Dr. Kaloostian testified that Dr. Durrani's operative and postoperative conduct met the applicable standard of care. Dr. Kaloostian explained that, although a patient may be experiencing ongoing pain symptoms after an operation, that does not mean that a doctor's treatment breached the standard of care.

### 2. *Dr. Derk Purcell*

{¶53} Dr. Derk Purcell, a neuroradiologist, testified that Dr. Durrani's interpretation of the radiographic imaging met the applicable standard of care. Dr. Purcell testified that from his own review of the MRI imaging from plaintiffs' office visits with Dr. Durrani, Dr. Durrani's interpretations of the MRIs and subsequent diagnoses recommending surgery were medically appropriate and did not breach the standard of care.

### F.  The Absent-Defendant Instruction

{¶54} Dr. Durrani did not attend the trial. With respect to Dr. Durrani's absence, the court instructed the jury that

> The defendant, Dr. Durrani, has not attended these proceedings
> in person. He is represented by counsel. You shall not speculate on why
> he is not present or consider his absence for any purpose except as
> instructed below . . . Dr. Durrani has voluntarily left the jurisdiction
> removing himself from plaintiff's ability to subpoena him to trial. . . .

> When a party, such as Dr. Durrani, has relevant evidence or testimony within his or her control, and the party fails to produce that relevant evidence or testimony, that failure gives rise to an inference that the evidence or testimony is unfavorable to that party.

The trial court further instructed the jury regarding making inferences:

> To infer or to make an inference is to reach a reasonable conclusion of fact which you may, but are not required to, make from other facts which you find have been established by direct evidence.
>
> Whether an inference is made rests entirely with you. You may not build one inference upon another inference. But you may make more than one inference from the same facts or circumstances.

### G. The Jury's Verdict

**{¶55}** Material to this appeal, the jury awarded past medical expenses of $23,095.78 to Boggs, $22,343.85 to Koch, and $42,078.47 to Stallings. The jury awarded future medical expenses of $750,000 to Boggs, $750,751.93 to Koch, and $150,000 to Stallings. The jury found that each plaintiff had suffered permanent physical functional injuries that prevented them from being able to care for themselves in performing life-sustaining activities.

**{¶56}** The jury awarded noneconomic damages totaling $1,614,404.22 to Boggs, $1,335,237.55 to Koch, and $809,588.20 to Stallings. The jury awarded $9 million in punitive damages, plus attorney's fees, to each plaintiff.

### H. The Evidentiary Hearing on Plaintiffs' Motions for Prejudgment Interest

**{¶57}** The trial court's entry reflected that, during the evidentiary hearing on plaintiffs' motions for prejudgment interest, plaintiffs' counsel testified that they made

a settlement offer of $1,000,000 on the first day of trial, followed by a $500,000 settlement offer on the second day of trial. While the trial court found that Durrani made a "firm settlement offer of $4 million to the remaining Durrani plaintiffs," which included the plaintiffs in the instant matter, it concluded that this amount "would have provided each of the approximately 400 remaining plaintiffs . . . with an amount that was far lower than what they likely would have received by going to trial in their individual cases." The trial court further found that, although the attorneys for plaintiffs had demonstrated that they had "rationally evaluated [their] risks and potential liability" Durrani had failed to do so in all three cases. In each matter, the trial court concluded that "Defendants failed to make a good-faith effort to settle" the cases while plaintiffs did make such a good-faith effort, and therefore, plaintiffs were entitled to prejudgment interest under R.C. 1343.03(C).

## I. Durrani's Motion for JNOV or a New Trial

**{¶58}** In April 2023, Durrani filed a combined motion requesting either a JNOV or in the alternative a new trial and remittitur in each matter. Durrani argued that the trial court erred by (1) consolidating the three cases, (2) not allowing Durrani to inquire as to Dr. Wilkey's time spent performing medical-legal work to establish whether he met the requirements of Evid.R. 601(B), (3) allowing Dr. Wilkey to testify as an expert when, at the time of trial, he did not meet the requirements of Evid.R. 601(B), (4) permitting plaintiffs to pursue a claim for past medical expenses at trial, and (5) instructing the jury that it was free to infer that because Dr. Durrani was voluntarily absent from trial, any evidence within his control that was not produced by virtue of his absence would have been unfavorable to him.

**{¶59}** In addition, Durrani argued that the verdicts were against the manifest weight of the evidence and contrary to law. Durrani asserted that (1) there was no

25

evidence offered regarding what future medical treatment that Boggs would require or the cost of such treatment to support the future-damages award or, in the alternative, the damages should be reduced by remittitur, (2) the noneconomic-damage award was subject to a reduction by statute, (3) the punitive-damage award is subject to a reduction by statute, (4) Durrani was entitled to a setoff, and (5) the trial court erred by permitting improper and inflammatory comments by plaintiffs' counsel.

{¶60} On August 14, 2024, the trial court overruled Durrani's arguments except as they related to noneconomic damages, punitive damages, and compensatory damages. The court stated that those damages must be reduced based on statutory damage caps.

### J. The Trial Court's Judgment on the Plaintiffs' Motion for Prejudgment Interest

{¶61} In its January 15, 2025 entry on prejudgment interest, the trial court reduced the jury's award based on the applicable statutory damages caps and awarded prejudgment interest in each case. As a result, the plaintiffs were awarded damages as follows: Boggs—$1,273.095.78 in compensatory damages and $35,774.26 in prejudgment interest; Koch—$1,273,095.78 in compensatory damages and $38,822.08 in prejudgment interest; and Stallings—$692,078.47 in compensatory damages and $95,673.44 in prejudgment interest. Each plaintiff was also awarded $25,000 in attorney's fees, $5,506.60 in court costs, and $350,000 in punitive damages.

{¶62} This appeal followed.

### II. Analysis

{¶63} Durrani raises four assignments of error on appeal, taking issue with the court's consolidation of the cases for trial, the court's denial of the combined JNOV

and new trial motions, and the court's award of prejudgment interest.

### A. *The Court Did Not Err by Joining these Cases for Trial*

**{¶64}** Durrani's first assignment of error asks this court to overrule our opinion in *Jones v. Durrani*, 2024-Ohio-1776 (1st Dist.), which recognized that Civ.R. 42(A) permits consolidated trials when common questions of law or fact are present. In the alternative, Durrani insists that they were prejudiced by the joint trials.

**{¶65}** In first assessing Durrani's challenge that *Jones* was wrongly decided, we review legal questions de novo. *Feagan v. Bethesda N. Hosp.*, 2024-Ohio-166, ¶ 15 (1st Dist.). Durrani reasserts the same argument that they have made in other appeals before this court—that *Jones* was legally incorrect. We rejected Durrani's argument in *Haggard v. Durrani,* 2025-Ohio-5327, ¶ 41 (1st Dist.), *Courtney v. Durrani*, 2025-Ohio-2335, ¶ 57 (1st Dist.), *Ravenscraft v. Durrani*, 2025-Ohio-2900, ¶ 91 (1st Dist.), and *Fenner v. Durrani*, 2025-Ohio-4477, ¶ 54-55 (1st Dist.), and do so here. "*Jones* remains the settled law of this appellate district." *Haggard* at ¶ 41.

**{¶66}** We next turn to Durrani's argument that the trial court erred in consolidating the plaintiffs' cases. We review a court's decision to hold joint trials for an abuse of discretion. *Ravenscraft* at ¶ 81, citing *Jones* at ¶ 20.

**{¶67}** Like in *Ravenscraft*, *Jones*, and *Courtney*, common questions of fact predominated in these cases, and consolidation was appropriate. All parties had received treatment within the same general area of the spine. Boggs had surgery along the L3-L4 vertebrae and Koch and Stallings were treated along the L4-L5 vertebrae. In all three cases, the plaintiffs alleged that Durrani made similar promises that surgeries would fix them. Plaintiffs relied on the same experts to argue alleged deficiencies in Dr. Durrani's treatment of the patients. While there are factual differences between the cases, such as Stallings being considerably older than Boggs

and Koch, and that the procedures Dr. Durrani performed on each plaintiff varied, Civ.R. 42(A) does not require identical facts. Plaintiffs raised similar claims, originating from similar surgeries along the same general area of the spine, resulting in common issues for plaintiffs. Therefore, the court below did not abuse its discretion when it consolidated the parties' cases for trial.

{¶68} Durrani's first assignment of error is, therefore, overruled.

### B. Defendant's Motion for a New Trial

#### 1. Standard of Review

{¶69} A trial court may grant a motion for a new trial under Civ.R. 59(A) for a variety of reasons. Civ.R. 59(A)(1)-(9). The standard of review of a trial court's ruling on a Civ.R. 59 motion depends upon the grounds for the motion. *See Berardo v. Felderman-Swearingen*, 2020-Ohio-4271, ¶ 7 (1st Dist.); *Yenni v. Yenni*, 2022-Ohio-2867, ¶ 60 (8th Dist.). Here, Durrani's motion alleged that the trial court's judgments were against the manifest weight of the evidence.

#### 2. Dr. Wilkey's Qualification as an Expert

{¶70} Durrani challenges Dr. Wilkey's qualifications to testify as an expert under Evid.R. 601, which prohibits a medical expert from testifying in a medical-malpractice action unless the person devotes one half of his professional time to clinical practice or teaching in the same or substantially similar specialty as the defendant doctor. The record supports the trial court's finding that Dr. Wilkey's volunteer time teaching medical students and seeing orthopedic patients at Five Rivers Health Center met this requirement. Further, the record shows that Dr. Wilkey qualified as an expert based on his time spent in active clinical practice and teaching at the time when the negligent acts occurred as plaintiffs incurred their respective injuries between 2010 and 2013. *See* Evid.R. 601(B)(5)(b) and 1002(Y).

### 3. Dr. Tayeb's Testimony

**{¶71}** We review the trial court's evidentiary decisions—including its decision to admit or exclude Dr. Tayeb's testimony—for an abuse of discretion. *Stephenson v. Durrani*, 2023-Ohio-2500, ¶ 27 (1st Dist.). An improper evidentiary ruling is a reversible error only when the error affected the substantial rights of the adverse party or violated the principles of justice. *Id.* at ¶ 78. Where a reviewing court determines that evidence was improperly admitted, it must then determine whether the error in the evidentiary ruling was harmless, which entails weighing the prejudicial effect of the error, and determine whether the outcome of the trial would have been different but for the error. *Id.*

**{¶72}** Durrani asserts that the trial court erred when it allowed Dr. Tayeb to offer prejudicial hearsay testimony. The issue of Dr. Tayeb's testimony is not new to this court. *See id.* at ¶ 27-37; *Densler v. Durrani*, 2024-Ohio-14, ¶ 16-20 (1st Dist.); *Bender v. Durrani*, 2024-Ohio-1258, ¶ 79 (1st Dist.); *Courtney*, 2025-Ohio-2335, at ¶ 62-68 (1st Dist.). Durrani cites *Stephenson* and *Densler* in support of their argument.

**{¶73}** *Stephenson* regarded the failure of plaintiff's counsel to establish a sufficient foundation for the admission of evidence concerning Dr. Durrani's alleged habitual response to provide a basis to allow Dr. Tayeb's testimony for the purposes of Evid.R. 406. *Stephenson* at ¶ 37. Here, Durrani does not raise whether a sufficient foundation was established; they only assert that Dr. Tayeb's testimony was prejudicial.

**{¶74}** In *Densler*, this court concluded that the admission of Dr. Tayeb's testimony was reversible error because Dr. Tayeb's testimony was the only testimony offered to show that Dr. Durrani told his patients that they would lose control of their bodily functions absent surgery, but plaintiff Densler's testimony was limited to

stating that Dr. Durrani told him he would be paralyzed without the surgery. *Densler* at ¶ 20. This court held that because the record provided "clear confirmation that the jury relied on the improperly admitted testimony when making its decision in this case, we cannot say that the jury—as the fact finder—would have reached the same conclusion absent the admission of Dr. Tayeb's testimony." *Id.*

{¶75} In these matters, however, Dr. Tayeb's testimony that Dr. Durrani told patients that he could fix them by undergoing surgery, the extent to which Dr. Durrani engaged patients in conservative treatment and encouraged them to have surgery over conservative treatment, Dr. Durrani's suggestion that paralysis would result without surgery, and his exaggeration of patients' conditions was echoed by the testimonies of Boggs, Koch, and Stallings, as well as Dr. Saini.

{¶76} Even if Dr. Tayeb's testimony was extracted, the record supports the jury's findings in each of these cases. The trial court's admission of Dr. Tayeb's testimony, therefore, was harmless. *See Ravenscraft*, 2025-Ohio-2900, at ¶ 96-107 (1st Dist.) (holding that the admission of Dr. Tayeb's testimony about Dr. Durrani's habitual assurances to patients was error where plaintiffs failed to a lay proper foundation for habit testimony, but the error was harmless because both patients testified that Dr. Durrani made similar assurances to them before their surgeries, and there was no indication the jury relied on the habit evidence to reach its verdict).

*4. Dr. Saini's Testimony*

{¶77} Durrani argues that Dr. Saini's testimony regarding what the surgeries consist of and the differences between certain surgeries, and that Dr. Durrani did not perform the surgeries correctly regarding the placement of screws, was beyond the scope of Dr. Saini's expertise. As Durrani has only raised issues specific to Dr. Saini's opinions of Boggs's treatment and care, the analysis will be confined to that portion of

Dr. Saini's testimony. As an appellant is required to reference the record in making arguments, we will not create an argument as to Dr. Saini's testimony regarding the treatment of Koch or Stallings. *See Clark v. Durrani*, 2025-Ohio-3096, ¶ 28 (1st Dist.) (reviewing courts will not create an argument to support an assignment of error where appellant fails to develop one).

**{¶78}** Expert testimony is governed by Evid.R. 702. A witness may testify as an expert when he is "qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony." *Ravenscraft* at ¶ 139; Evid.R. 702(B). In Ohio, a witness testifying in a medical-malpractice case "need not practice in the exact same specialty as that of the defendant-physician; rather, it is the scope of the witness's knowledge and not the artificial classification by title that should govern the threshold question of his qualifications." *Id.*, quoting *Adams v. Durrani*, 2022-Ohio-60, ¶ 50 (1st Dist.). So long as the expert witness demonstrates knowledge of the standards of the specialty, and that knowledge enables the witness to provide expert testimony involving whether the defendant's conduct conformed with that specialty's particular standards, the witness is competent to testify as an expert. *Id.*

**{¶79}** This court has previously addressed whether Dr. Saini's testimony exceeded the scope of his expertise. Here, Durrani raises Dr. Saini's testimony regarding the placement of the pedicle screw. Like in *Stephenson*, however, the trial court sustained defense counsel's objection and any testimony as to placing the screws "improperly" was not admitted. *See Stephenson,* 2023-Ohio-2500, at ¶ 73 (1st Dist.). As to Durrani's remaining challenges, this court addressed similar arguments in *Ravenscraft*, in which we stated,

> Next, the Durrani parties argue that Dr. Saini's discussion of

TLIF surgeries, recovery time, and Dr. Durrani's technique in Bowling's surgery fell outside of his expertise. But Dr. Saini described the purpose of a TLIF to explain that evidence of a healed fusion appears within "six months to a year . . . through a radiologic study." He discussed laminectomies to show why Ravenscraft's imaging conflicted with Dr. Durrani's finding that Ravenscraft had a prior laminectomy. Dr. Saini also testified that he reviewed Bowling's postoperation film, which made him "wonder[] whether this pedicle screw was put in correctly or not, because it looks like it's more laterally displaced. These tiny little dots [are] from the anterior spinal fusion. It's from the TLIF." This testimony concerned Dr. Saini's interpretation of Ravenscraft's and Bowling's imaging, which falls within his area of expertise as a neuroradiologist.

*Ravenscraft*, 2025-Ohio-2900, at ¶ 143 (1st Dist.).

**{¶80}** As Dr. Saini's testimony in the instant matter nearly mirrors that in *Ravenscraft*, the same reasoning applies here. Accordingly, the trial court did not abuse its discretion in permitting Dr. Saini's testimony as it was within his expertise.

### 5. Irrelevant Testimony

**{¶81}** Durrani alleges that the trial court erred when it permitted the jury to hear irrelevant testimony concerning surgeries that were not at issue at trial and that he was prejudiced as a result.

**{¶82}** From the outset of trial, the court imposed a limiting instruction that parties' were to refrain from referencing procedures that were not at issue at trial. However, references to prior procedures could be made for the limited purposes of establishing the plaintiffs' medical backgrounds and explaining how Dr. Durrani met

the plaintiffs. Now, Durrani alleges that statements were introduced that exceeded the scope of the limiting instruction in each of the plaintiffs' cases.

{¶83} For Boggs, Durrani argues the jury heard irrelevant testimony from Dr. Saini. Dr. Saini testified concerning an operation that was not the subject of Boggs's complaint and expressed concern with the presence and alignment of a pedicle screw that was observed on an X-ray scan. Dr. Saini disagreed with Dr. Durrani's report claiming the screw that was used to fuse Boggs's vertebrae was "excellently placed" and testified that the screw could be touching a blood vessel or another organ inside Boggs's pelvis, which could pose a postoperation complication.

{¶84} Durrani also takes issue with Koch's and Dr. Wilkey's testimony that Dr. Durrani performed Koch's first surgery at CCHMC in 2007 and that she continued to visit Dr. Durrani at CAST. Durrani argues that this reference to the initial surgery "suggested a clinical connection" to the first surgery and all subsequent surgeries that were the focus at trial. Durrani asserts that the repeated reference to surgeries that were not at issue at trial mislead the jury to believe that Dr. Durrani was an incapable doctor, which was prejudicial to his credibility. For Stallings, Durrani takes similar issue with Dr. Wilkey's testimony that Stallings had his L4-L5 vertebrae fused in 2005.

{¶85} In considering whether the trial court's admission of the statements made by Dr. Wilkey and Koch constitutes a reversible evidentiary error we hold that the statements were not violative of the court's limiting instruction. Their testimony was made in alignment with the limited purpose of establishing a patient's surgical history. Despite Durrani's assertion that these remarks were improper, they provided a factual background of the care each plaintiff received prior to the procedures that Dr. Durrani performed on them at CAST.

{¶86} At worst, the admission of Dr. Saini's remarks constitutes a harmless

error. Following Dr. Saini's remarks that the screw could cause a postoperative complication, Durrani objected, and the court sustained the objection. Counsel for Koch immediately stated that "we're not here to criticize the first surgery." Nothing in the record demonstrates that the jury relied upon this portion of Dr. Saini's testimony when it made its findings.

### 6. *The Jury Instruction on Dr. Durrani's Absence*

**{¶87}** This court has considered this same instruction, verbatim, in *Clark*, 2025-Ohio-3096, at ¶ 20 (1st Dist.); *see Ravenscraft*, 2025-Ohio-2900, at ¶ 135-136 (1st Dist.). Based on our precedent, the instruction given to the jury was not an abuse of discretion.

**{¶88}** Based on the foregoing, Durrani's second assignment of error is overruled.

### C. *The Trial Court's Denial of Durrani's JNOV Motion*

### 1. *JNOV Motions*

**{¶89}** Under Civ.R. 50(B)(1), a party may move for JNOV after the trial court enters judgment on the jury's verdict. Indeed, "[a] motion for [JNOV] is used to determine only one issue: whether the evidence is totally insufficient to support the verdict." (Citations omitted.) *Grieser v. Janis*, 2017-Ohio-8896, ¶ 15 (10th Dist.).

**{¶90}** We review a court's JNOV ruling de novo. *Bender*, 2024-Ohio-1258, at ¶ 123 (1st Dist.). We must assess the legal sufficiency of the evidence, while construing the evidence in a light most favorable to the nonmoving party, and may "only reverse if reasonable minds could only find in favor of the moving party." *Id.*

### 2. *Future Medical Damages*

**{¶91}** Durrani alleges that the parties put forth speculative testimony and that the jury erroneously relied on this testimony when awarding Boggs $750,000, Koch

$750,751.93, and Stallings $150,000 in future medical damages.

**{¶92}** Material to this appeal is how Durrani frames their arguments within this assignment of error. Durrani has contended throughout this appeal that the court's overruling of their JNOV motion was an error and, amongst other justifications listed, the jury's future-medical-damages award was against the manifest weight of the evidence. Despite the conclusory language setting forth a manifest-weight challenge, the body of Durrani's argument appears to set forth a sufficiency argument.

**{¶93}** We will infer from the body of Durrani's argument that they have set forth the correct legal argument for appeal. As it pertains to the manifest-weight challenge, this argument ignores the principle that when ruling on a Civ.R. 50(B) motion, an appellate court may not weigh the evidence or assess the credibility of the witnesses. *Gindling v. Shiff*, 2012-Ohio-764, ¶ 14 (1st Dist.), citing *Bair v. McDonagh*, 2008-Ohio-3698, ¶ 46 (1st Dist.). We now must assess whether the evidence was insufficient to support the jury's future-damages award.

**{¶94}** "A plaintiff's claim for future medical expenses must be supported by evidence that reasonably establishes the amount to be incurred in the future." *Potts v. Durrani*, 2023-Ohio-4195, ¶ 58 (1st Dist.), quoting *Setters v. Durrani*, 2020-Ohio-6859, ¶ 40 (1st Dist.). A future-medical-expenses award must be supported by reasonably certain costs and cannot be purely speculative. *Bender*, 2024-Ohio-1258, at ¶ 136 (1st Dist.), citing *Setters* at ¶ 40. "[T]here must be some data furnished to the jury upon which to predicate an estimate of future costs." *Potts* at ¶ 58, citing *Setters* at ¶ 40, quoting *Waller v. Phipps*, 2001 Ohio App. LEXIS 4119, *10-11 (1st Dist. Sept. 14, 2001); *see MADFAN, Inc. v. Makris*, 2017-Ohio-979, ¶ 12 (8th Dist.) ("Future damages cannot be based on a mere guess or speculation, there must be some data on which a reasonable estimate of future expenses can be derived."). We have recognized

that evidence of how long and often a plaintiff would require treatment, as well as the cost of treatment, is sufficient to support a future-damages award. *Potts* at ¶ 45, citing *Setters* at ¶ 45. Without evidence in the record reflecting that the jury's award was manifestly excessive, a reviewing court may not interfere with a jury's verdict on damages. *Bowers v. Next Generation Films, Inc.*, 2009-Ohio-1153, ¶ 42 (5th Dist.).

**{¶95}** A similar set of facts to those in this case was present in *Bender*. There, an expert testified that the plaintiff would require a particular procedure and subsequent physical rehab, which would cost between $150,000 and $200,000. *Bender* at ¶ 138. The expert also asserted that the corrective procedure was necessary to correct a defective procedure. *Id.* at ¶ 137-138. While the jury only awarded the plaintiff $10,000, we concluded that this testimony was not speculative and sufficiently supported an award for future damages. *Id.* at ¶ 139.

**{¶96}** Here, Dr. Wilkey offered expert testimony for all three plaintiffs. Dr. Wilkey testified that the plaintiffs would likely require two procedures, one with a 33 percent likelihood, the other, a fusion procedure at the L4-L5 vertebrae, with a greater than 50 percent likelihood. Dr. Wilkey testified that it was a medical certainty that the patients would need the fusion procedure, and that the procedure could cost anywhere from $150,000 to $300,000. While Dr. Wilkey admitted that he was not exactly sure what pain management the plaintiffs were undergoing, he testified that if plaintiffs ever needed epidural injections, that could range in annual costs from $20,000 to $100,000.

**{¶97}** The plaintiffs also testified that they continued to experience back pain, that they have continued to seek medical care because of Durrani's procedures, and that they have sustained costs.

**{¶98}** In sum, the plaintiffs put forth sufficient evidence to support an award

of future medical expenses. Based on the testimony elicited that all patients have remained in pain, that it was a medical certainty that each would require a corrective procedure in the future, and that they would incur pain-management costs in the future, and the fact that the plaintiffs submitted medical records and bills to the jury, there was sufficient evidence from which the jury could extrapolate reasonably certain future costs.

**{¶99}** Durrani does not make any specific challenge to the amount of the jury's award of future medical expenses. Rather, Durrani's limited argument asserts, without explanation, that there was no evidence of future damages that went beyond mere speculation or conjecture. Durrani has thus failed to demonstrate that the evidence was insufficient to support an award for future medical expenses. Therefore, we overrule Durrani's challenge to the jury's future-medical-damages award.

### 3. *Set-off with Other Tortfeasors*

**{¶100}** Durani alleges that the court erred by denying his motion for a set-off of the damages. Durrani recognizes that the trial court's decision denying a set-off was in accordance with this court's holdings in *Adams*, 2022-Ohio-60 (1st Dist.), and *Eysoldt v. Proscan Imaging*, 2011-Ohio-6740 (1st Dist.). However, Durrani cites to the opinion from the United States Court for the Southern District of Ohio in *Gorsha v. Clark*, 2022 U.S. Dist. LEXIS 16485 *6-8 (S.D. Ohio Jan. 31, 2022), which assesses the construction of the set-off statute, R.C. 2307.28(A). Durrani argues that the district court's analysis in *Gorhsa* indicates that our interpretation of R.C. 2307.28(A) was incorrect.

**{¶101}** As evidenced by our recently published opinions in *Fenner*, 2025-Ohio-4477, ¶ 121 (1st Dist.), and *Haggard*, 2025-Ohio-5327, ¶ 83-86 (1st Dist.), Durrani's argument is meritorious. In *Fenner*, *Haggard*, and the present *Boggs*, *Koch*, and

37

*Stallings* triumvirate, Durrani sought a set-off of damages based on the plaintiffs' settlement with the other defendants. *See Fenner* at ¶ 122. In *Fenner*, we overruled *Eysoldt* and *Adams* in part and have now held that "Pursuant to the plain language of R.C. 2307.23(A), [Durrani is] entitled to a set-off based on [plaintiffs'] settlement with West Chester and UC Hospital." *Id.* at ¶ 128. Durrani's third assignment of error is sustained in part as to the issue regarding set-off and the cause is remanded to the trial court to assess the amount of set-off to which Durrani is entitled. The remaining issues raised are overruled.

### D. *Prejudgment Interest*

**{¶102}** In their fourth assignment of error, Durrani argues that the court erred when it included prejudgment interest in its award to plaintiffs because plaintiffs failed to make a good-faith effort to settle their cases.

**{¶103}** A trial court must award prejudgment interest when it determines that the requirements under R.C. 1343.03(C) have been met: (1) the party seeking prejudgment interest must petition the court and the trial court (2) held a hearing on the motion, (3) found that the nonmoving party failed to make a good-faith effort to settle, and (4) found that the moving party made a good-faith effort to settle the case. *Bender*, 2024-Ohio-1258, at ¶ 150 (1st Dist.); *see Kalain v. Smith*, 25 Ohio St.3d 157 (1986), paragraph one of the syllabus.

**{¶104}** Although a prejudgment-interest award is not discretionary, the trial court has discretion to determine whether a party acted in good faith if the trial court determines that the moving party met R.C. 1343.03(C)'s four requirements. *Bender* at ¶ 151. The trial court's determination as to whether a party acted in good faith is reviewed for an abuse of discretion. *Id.* "A trial court has wide discretion in deciding whether to award prejudgment interest based upon the evidence of the parties'

settlement efforts." *Id.* at ¶ 152, quoting *Jeffrey v. Marietta Mem. Hosp.*, 2013-Ohio-1055 ¶ 80 (10th Dist.). If the record contains competent, credible evidence supporting the trial court's decision, there is no abuse of discretion. *Id.* at ¶ 151. The party seeking prejudgment interest bears the burden of demonstrating the party's entitlement to the award. *Id.* at ¶ 152. To determine whether a party acted in good faith, courts must focus on the parties' pretrial settlement efforts. *Id.*

{¶105} In *Bender*, this court explained the Supreme Court's test to determine if a party made a good-faith effort to settle. We stated,

> The Supreme Court of Ohio has defined good faith in the negative. A party did not fail to make a good-faith pretrial effort to settle when it "(1) fully cooperated in discovery proceedings, (2) rationally evaluated [its] risks and potential liability, (3) [did] not attempt[] to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party." *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 659 (1994), quoting *Kalain v. Smith*, 25 Ohio St.3d 157 (1986), syllabus. Moreover, when "a party has a good faith, objectively reasonable belief that he has no liability, [he or she] need not make a monetary settlement offer." *Id.* Courts should strictly construe when a party does not need to make a settlement offer. *Id.*

(Cleaned up.) *Bender* at ¶ 153.

### 1. *Plaintiffs Made a Good-Faith Effort to Settle*

{¶106} Durrani argues that plaintiffs failed to make a good-faith settlement

demand because plaintiffs initially demanded $1,000,000[2] before trial commenced, then demanded $500,000 on the second day of trial.

{¶107} A plaintiff's settlement demand must be based on an objectively reasonable belief that the amount demanded in settlement could be awarded under applicable law. *Fenner v. Durrani*, 2025-Ohio-4477, ¶ 96 (1st Dist.). This includes any applicable statutory caps on damages. *Id.* Here, Durrani asserts that, as each plaintiff's past-medical damages were less than $25,000, the plaintiffs would have had to show more than $9 million in future-economic damages and attorney's fees based on the statutory caps on economic and noneconomic damages. The record, however, tells us otherwise.

{¶108} Under Ohio's statutory scheme, a plaintiff could receive a maximum of $350,000 in punitive damages and $500,000 in noneconomic damages. *See* R.C. 2315.21(D)(2)(b), 2323.43(A)(2), and 2323.43(A)(3). While the trial court's posttrial judgments reduced each plaintiff's punitive and noneconomic damages based on those statutory caps, each plaintiff's total damages that were awarded—which included prejudgment interest, taxable costs, and attorney's fees—still exceeded $1,000,000. Hence, the plaintiffs' initial $1,000,000 offer and subsequent $500,000 offer were based on an objectively reasonable belief that they could be awarded these amounts where they sought economic damages for past medical expenses, noneconomic damages for pain and suffering, punitive damages, and attorney's fees. *See Fenner* at ¶ 103. Plaintiffs' demands, therefore, were made in good faith.

### 2. *Durrani Failed to Make a Good-Faith Effort to Settle*

{¶109} Conspicuously missing from Durrani's argument is the trial court's

---

[2] Durrani erroneously states that plaintiffs made an initial settlement offer of $10 million, but the record shows that plaintiffs initially offered $1,000,000.

finding in all three cases that Durrani failed to make a good-faith effort to settle the case.[3]

{¶110} Durrani previously argued in *Bender* that the plaintiffs in that matter failed to show that they made a good-faith effort to settle the case because they made a $1,000,000 demand on the first day of trial. *Bender*, 2024-Ohio-1258, at ¶ 156 (1st Dist.). This court considered *Burton v. Slusher*, 2008-Ohio-4812, ¶ 85-93 (7th Dist.), another medical-malpractice case in which the Seventh District held that the R.C. 1343.03(C) prejudgment-interest award against a physician was not an abuse of discretion because (1) the physician made no settlement offer before trial, (2) his in-trial offers were not the type of offers contemplated by R.C. 1343.03(C), and (3) the offers made were much less than the verdict that was returned against him, where the jury awarded appellee $750,000 and the physician's pretrial settlement offer was $0. *Bender* at ¶ 158.

{¶111} Based on *Burton*, the *Bender* court pointed out that, as Durrani made no settlement offers before the jury rendered its verdict, the jury rendered an award which was astronomically larger than what Durrani offered—which, with respect to those plaintiffs, was nothing. *Id.* at ¶ 159. This court held,

> There was some competent, credible evidence supporting the trial court's bad-faith finding. Accordingly, we hold that the trial court's prejudgment-interest award was not arbitrary, unreasonable, or unconscionable, and we overrule defendant's second assignment of error.

---

[3] Of note, Durrani did not raise prejudgment interest in the JNOV motion. In a January 15, 2025 entry, however, the trial court noted Durrani's disagreement with the court's decision as to prejudgment interest and stated that its entry was not to be construed in a way to limit Durrani's appellate rights regarding prejudgment interest, fees, or costs award or damages.

*Id.* at ¶ 160.

**{¶112}** Although the facts in the instant matter are different from the facts in *Bender*, there is nothing in the record to show that the trial court abused its discretion when it determined that Durrani's global settlement offer of $4,000,000 for the remaining 400 Durrani plaintiffs—which would have been a $10,000 award for each plaintiff—was not made in good faith. This is particularly so where the plaintiffs in the instant matter were awarded damages significantly larger than $10,000. Durrani's fourth assignment of error is, therefore, overruled.

### III. Conclusion

**{¶113}** In sum, Durrani's first, second, and fourth assignments of error are overruled, and the third assignment of error is overruled in part and sustained in part as it relates to Durrani's arguments for a set-off. For the reasons set forth above, the judgments of trial court are affirmed in part, and reversed in part, and the cause is remanded to the trial court to determine the amount of the set-off to which Durrani is entitled.

Judgments affirmed in part, reversed in part, and cause remanded.

**NESTOR, J.,** concurs.
**ZAYAS, P.J.,** concurs separately.

**ZAYAS, P.J.,** concurring separately.

**{¶114}** I concur in the majority's opinion. I write separately only to discuss the postjudgment assessment of prejudice from the joinder of trials under the first assignment of error.

**{¶115}** In the first assignment of error, appellants argue that the trial court "should have ordered new trials with single plaintiffs." In doing so, they assert two arguments: (1) the cases should not have been joined for trial under Civ.R. 42 as there

42

was no common question of law or fact, and (2) the joint trial prejudiced Durrani.

{¶116} I agree with the majority's opinion that resolution of this assignment of error is ultimately governed by *Jones v. Durrani*, 2024-Ohio-1776 (1st Dist.), and its progeny. I write separately, as I did in *Fenner v. Durrani*, 2025-Ohio-4477, ¶ 130, 133-147 (1st Dist.), to clarify the proper postjudgment considerations when assessing prejudice from the joinder of trials under Civ.R. 42.

{¶117} Regarding prejudice, appellants argue that the joint trial was an "end-run around" Evid.R. 403(A) that allowed improper consideration of other malpractice evidence that would not have happened, or been permitted, absent the joinder of trials.

{¶118} When conducting a postjudgment assessment of any prejudice that resulted from the joinder of trials under Civ.R. 42, this court must ultimately look to the record to determine whether substantial justice has been done to the complaining party. *See* Civ.R. 61 ("No error in the admission . . . of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to be inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceedings which does not affect the substantial rights of the parties."); R.C. 2309.59 ("In every stage of an action, the court shall disregard any error or defect in the . . . proceedings which does not affect the substantial rights of the adverse party. No final judgment or decree shall be reversed or affected by reason of such error or defect. . . . If the reviewing court determines and certifies that, in its opinion, substantial justice has been done to the party complaining as shown by the record, all alleged errors or defects occurring at the trial shall be deemed not prejudicial to the party complaining and shall be disregarded,

and the final judgment or decree under review shall be affirmed. . . .").

{¶119} ""Generally, in order to find that substantial justice has been done to [a party] so as to prevent reversal of a judgment for errors occurring at the trial, the reviewing court must not only weigh the prejudicial effect of those errors but also determine that, if those errors had not occurred, the jury or other trier of the facts would probably have made the same decision."" *Beard v. Meridia Huron Hosp.*, 2005-Ohio-4787, ¶ 35, quoting *O'Brien v. Angley*, 63 Ohio St.2d 159, 164-165 (1980).

{¶120} "In ascertaining whether prejudicial error exists, the court is 'bound by the disclosures of the record.'" *Hayward v. Summa Health Sys.*, 2014-Ohio-1913, ¶ 25, citing *Makranczy v. Gelfand*, 109 Ohio St. 325, 329 (1924).

{¶121} Where a thorough review of the record shows that the jury properly considered each case separately and on its own merit, as instructed, the record does not indicate prejudice from the joinder of trials under Civ.R. 42 that is inconsistent with substantial justice. *See, e.g., Courtney v. Durrani*, 2025-Ohio-2335, ¶ 58 (1st Dist.); *see also Jones*, 2024-Ohio-1776, at ¶ 26 (1st Dist.).

{¶122} Here, while the appellants do not discuss whether substantial justice has been done, in arguing that there is "a strong chance" that "the outcome" would have been different absent the joinder of trials, they only point to the fact that the jury awarded matching punitive damages in each case. However, this court has already rejected the argument that matching punitive damages awards, alone, is sufficient to show reversible error when considering the extent of any actual prejudice that resulted from the joinder of trials. *See Fenner*, 2025-Ohio-4477, at ¶ 53 (1st Dist.); *Courtney* at ¶ 58.

{¶123} Therefore, I concur with the majority's resolution of the first assignment of error as the appellants have failed to show that reversal on the basis of actual

prejudice was warranted here.